**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

---------------------------------------------------

DETROIT ENTERTAINMENT, L.L.C.,

Plaintiff,

-against-

AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY,

Defendant.

---------------------------------------------------

Case No. 4:21-cv-10661

Honorable Matthew F. Leitman

Magistrate Judge R. Steven Whalen

**SECOND AMENDED COMPLAINT**

HONIGMAN LLP
J. Michael Huget (P39150)
Andrea Hansen (P47358)
Adam M. Wenner (P75309)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Tel: (313) 465-7000
mhuget@honigman.com
ahansen@honigman.com
awenner@honigman.com

PILLSBURY WINTHROP SHAW PITTMAN LLP
Joseph D. Jean
Janine M. Stanisz
Scott D. Greenspan
31 West 52nd Street
New York, New York 10019
Tel: (212) 858-1000
joseph.jean@pillsburylaw.com
janine.stanisz@pillsburylaw.com
scott.greenspan@pillsburylaw.com

*Attorneys for Plaintiff Detroit Entertainment, L.L.C.*

---------------------------------------------------

## SECOND AMENDED COMPLAINT

Plaintiff Detroit Entertainment, L.L.C. ("Detroit Entertainment"), for its Second Amended Complaint for breach of contract, a declaratory judgment and damages against Defendant American Guarantee and Liability Insurance Company ("AGLIC"), alleges as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1. Detroit Entertainment owns and operates the MotorCity Casino Hotel ("MotorCity"), an award-winning and innovative entertainment complex in Detroit, Michigan. MotorCity offers a 400-room luxury hotel, spa facilities, numerous dining options, large theater, conference center, and world-class gaming. MotorCity is also Detroit's only locally owned and operated casino complex, and its management and staff volunteer in a number of programs that make a difference in the local community, including through philanthropic partnerships. MotorCity normally employs over 2,600 people, with more than half historically residing in Detroit.

2. AGLIC is a member of the Zurich group of insurance companies – one of the world's largest and most powerful insurers. This Complaint arises from AGLIC's denial of coverage for Plaintiff's losses arising from the SARS-CoV-2 virus ("Coronavirus") and the disease it causes, Coronavirus Disease 2019 ("COVID-19"), and the direct physical loss of or damage to property and business

interruption they caused under the "all-risk" insurance policy AGLIC sold to Detroit Entertainment (the "Policy").

3. This case is about six main issues:

- the physical and material alteration of and the physical damage to the indoor air, surfaces and other property within Detroit Entertainment's facilities from the repeated invasion and reintroduction of Coronavirus and COVID-19;
- the physical and material alteration of and the physical damage to the property within Detroit Entertainment's facilities from the chemicals used by Detroit Entertainment in its attempt to clean and disinfect Coronavirus to make its facilities safer and more fit for their normal and intended use, requiring, in some instances, the removal, replacement or repair of property within those facilities due to such damage;
- the inability of Detroit Entertainment to effectively remove Coronavirus/COVID-19 from its facilities' indoor air and surfaces via cleaning, disinfection or dissipation due to the virus's repeated reintroduction into that indoor air and surfaces;
- the fact that, under the Policy, communicable diseases are a covered cause of loss that cause physical loss of or damage to property and trigger the Policy's Time Element (business interruption) coverage,

among others – a fact AGLIC effectively admitted when it paid out $100,000 in Communicable Disease coverage to Detroit Entertainment but then, placing its own economic interests far above the interests of its policyholder, failed to pay a penny of Detroit Entertainment's hundreds of millions of dollars in business interruption losses;

- the Policy's Time Element coverage for a mere slowdown of Detroit Entertainment's business operations caused by physical loss of or damage to covered property and its lack of a requirement for permanent dispossession, untenantability or uninhabitability to trigger that coverage – coverage-enhancing policy language not present in the policy at issue in *Brown Jug, Inc. v. Cincinnati Ins. Co.,* 27 F.4th 398 (6th Cir. 2022), where the untenantability of the insured premises was a threshold requirement of its business interruption coverage; and
- the measurement of the Period of Liability under the Policy (commonly referred to in most all-risk policies as the Period of Restoration), that is, the period of time that Detroit Entertainment needed to repair, restore or replace its property damaged by either Coronavirus or the chemicals it used to attempt to clean and disinfect Coronavirus and remove it from the MotorCity complex. That is a purely factual issue. AGLIC never measured that period because it performed no real investigation of the

claim or the significant physical loss of or damage to property experienced by Detroit Entertainment not only from Coronavirus but also from its attempts to operate as closely to normal as possible or to restore its operations to normal.

4. On January 21, 2020, the first case of COVID-19 was identified in the United States. By the end of March 2020, non-essential businesses, schools, and places of worship closed their doors in an effort to stop the proliferation of the deadly virus, which spreads through aerosols or droplets from infected persons, remaining in the air and on surfaces for hours to days, and repeatedly reintroduced by infected persons. Coronavirus invaded, transformed, and physically and materially altered and damaged the air and surfaces of indoor spaces of Detroit Entertainment's insured properties. The presence of the virus on Detroit Entertainment's premises caused physical loss of or damage to its properties, triggering property and business interruption coverage under the Policy.

5. To combat the presence of Coronavirus and to attempt to eliminate it from the premises through disinfection and cleaning, Detroit Entertainment deployed powerful aerosol fogging and surface disinfecting agents. These agents, however, caused physical damage and physical and material alteration to Detroit Entertainment's property including, for example, its electronic gaming machines that are at the heart of its revenue generation. As a result of this damage, this

property ceased to function as intended or had to be taken out of service for repairs or replacement, causing Detroit Entertainment to sustain both property and Time Element losses and other losses covered by the Policy.

6. The Policy sold by AGLIC is a high-end, "all-risk" commercial property insurance policy, with incredibly high premiums, covering Detroit Entertainment's properties and the income stream from its activities on the insured properties. The Policy covers business interruption losses (referred to in the Policy as its "Time Element" coverage) from the slowdown of Detroit Entertainment's business activities, as well as the complete cessation of business activities (defined in the Policy as "Suspension"), caused by physical loss of or damage to its properties as wrought by Coronavirus and COVID-19. The Policy's Time Element coverage is the heart of the Policy and the centerpiece of the Policy's protection of Detroit Entertainment's business operations. It is a key driver of the Policy's costly, top-end coverage offered by Zurich and its affiliate AGLIC to only the largest policyholders in the country willing to pay the highest premiums.

7. The Policy also specifically includes sweeping coverages, including affirmative coverages for losses arising from physical loss of or damage caused by communicable disease. Detroit Entertainment paid very substantial premiums to purchase a high-end policy with this affirmative coverage, which is simply not found in the lion's share of all-risk policies. This key feature distinguishes the Policy from

the policy at issue in *Brown Jug*, 27 F.4th at 398 or those at issue in virtually all the other appellate decisions involving COVID-19 insurance coverage– which lacked affirmative communicable disease coverage.

8. Due to the physical loss of or damage to Detroit Entertainment's properties caused by the presence of Coronavirus and by the aerosol fogging and surface disinfecting agents used to attempt to clean and disinfect Coronavirus from those properties, the Detroit Entertainment properties were forced to operate at a reduced capacity and also Detroit Entertainment had to repair or replace or remove damaged property from service. As a result, Detroit Entertainment suffered massive losses exceeding $270 million. But when Detroit Entertainment turned to its insurance carrier for coverage, reasonably expecting its high-end insurance policy to compensate it for its losses from Coronavirus and COVID-19, AGLIC failed to honor its Policy obligations to Detroit Entertainment, refusing to pay anything more than $100,000 for Communicable Disease loss.

9. At the same time they were denying or failing to pay claims, AGLIC and other industry insurers, upon information and belief, were raising premiums following the emergence of Coronavirus and COVID-19. The result of AGLIC's and the other insurers' behavior (i.e., denying claims and raising premiums) is a profit bonanza of historic proportions that belies the insurance industry's repeated and false warnings to courts and the media that paying Coronavirus and

COVID-19-related claims would bankrupt them and shatter the insurance market. In reality, AGLIC and other insurers have been recording record profits.

10. By way of example only, on February 10, 2022, Zurich Insurance Group ("Zurich") (the ultimate parent company of AGLIC) reported one of "the best results in its history,"[1] with its Property & Casualty segment, reporting skyrocketing profit in part due to the "***improved net impact from COVID-19***".[2] As Zurich put it, its financial success was "driven by commercial insurance across all regions, with the level of price increases well above claims cost inflation.[3] Simply put, Zurich and AGLIC raised their premiums while denying or failing to pay claims just like Detroit Entertainment's.

11. Given AGLIC's breach of its contractual promises of coverage while reaping a windfall from Coronavirus and COVID-19, Plaintiff now turns to this Court for relief, seeking a declaratory judgment as to the scope and breadth of its rights under its high-end policy, and damages for breach of contract. In the wake of the devastation to its insured properties caused by Coronavirus and COVID-19, Detroit Entertainment should be allowed to rely on its insurance policy, and AGLIC

---

[1] *Zurich delivers one of the best results in its history; expects to meet or exceed all 2022 targets*, ZURICH (Feb. 10, 2022), https://www.zurich.com/media/news-releases/2022/2022-0210-01 (last visited May 21, 2022).

[2] *Id.* (emphasis added).

[3] *Id.*

should be made to account to Detroit Entertainment.

## THE PARTIES

12. Detroit Entertainment is a limited liability company formed under the laws of Michigan with its principal place of business in Michigan.

13. Upon information and belief, AGLIC is a corporation formed under the laws of New York with its principal place of business in Illinois.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

15. This Court has general personal jurisdiction over AGLIC pursuant to Fed. R. Civ. P. 4(k)(1)(A) and MCL § 600.711(3) because AGLIC carries on a continuous and systematic part of its general business within the state, including but not limited to marketing, selling, and issuing insurance policies to Michigan businesses and insuring property in Michigan.

16. This Court also has limited personal jurisdiction over AGLIC pursuant to MCL § 600.715(4) because AGLIC contracted to insure property and/or risk located within this state at the time of contracting, and out of which this action arose.

17. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because AGLIC conducts business in the Eastern District of Michigan and Detroit

Entertainment resides in the Eastern District of Michigan.

## FACTUAL BACKGROUND

### A. MotorCity

18. Detroit Entertainment owns and operates MotorCity, the only locally owned and operated casino in Detroit. Detroit Entertainment's business operations involve much more than a casino. MotorCity has long positioned itself as a destination resort, with an array of hospitality offerings. Its 400-room hotel includes 33 suites and offers acclaimed luxury amenities and technology, as well as stunning views of downtown Detroit. The complex includes the D.Tour Spa, a 13,000 square-foot spa including lounges, whirlpools, steam rooms, saunas and 10 private treatment rooms. MotorCity offers various dining and drinking options, including in bars and lounges throughout the complex, at the extensive food court, in a (now closed) fine dining restaurant known as "Iridescence," at a sit-down diner and an expansive buffet, and using a food truck that has operated at various locations in the metropolitan Detroit area. The approximately 2,400-person capacity Sound Board theater hosts world-class entertainment, including musical acts and comedians, and has been acclaimed as one of the top live performance venues in the city. MotorCity's 67,500 square feet of banquet and meeting space is used for corporate meetings, weddings, and other events. Central to MotorCity's operations is its two-level casino and sportsbook, offering sports betting and some of the most exciting

and popular casino gaming in the region, including in a poker room and in a VIP gaming room with its own buffet.

19. MotorCity draws guests and patrons from all over the Midwest, the country, and the world. It is also a short distance away from a bustling downtown that boasts many business amenities, office buildings, and tourist attractions that draw patrons to the facility, including but not limited to: Comerica Park (home to Detroit Tigers baseball); Little Caesar's Arena (home to Detroit Red Wings hockey and Detroit Pistons basketball, and a large concert venue); Ford Field (home to Detroit Lions football); Detroit Opera House; the iconic and historic Fox Theatre and Majestic Theatre; TCF Center, and numerous restaurants and bars in the downtown area.

20. MotorCity generally draws over 5 million visitors annually. It employs more than 2,600 people when operating in the normal course and is known for high rates of management and employee participation in philanthropic programs that make a difference in the local Detroit community, including partnerships with Neighborhood Service Organization, Detroit Branch NAACP, Vista Maria, Southwest Detroit Business Association, Mariners Inn, Christ Child House, Woodbridge Neighborhood Association, Phoenix Center, American Cancer Society, Wish Upon a Teen, Women in Touch, and Alternatives for Girls. MotorCity is key to the economic livelihood of Detroit and Michigan—the gaming industry as a whole

contributes over $6.3 billion in annual impact, over 38,000 jobs supported and over $1.3 billion in annual tax revenue generated to the state economy.[4]

21. As a part of its prudent business practices and in recognition of its responsibilities to its employees, its community, and its customers, Detroit Entertainment maintains insurance coverage.

22. Detroit Entertainment specifically maintains, through the Policy, "all-risk" commercial property coverage with AGLIC, covering not only more commonly occurring risks like fire, but also entirely unanticipated and novel risks that may arise. The applicable AGLIC Policy was effective from December 1, 2019 to December 1, 2020 (the "Policy Period") (Ex. 1).

23. As described below in greater detail, the Policy covers all "*loss of or* damage to" Detroit Entertainment's property, unless expressly excluded (emphasis added).

## B. Coronavirus and COVID-19

24. COVID-19 is a severe infectious disease caused by Coronavirus. Coronavirus can cause serious systemic illness and death.[5] Coronavirus is primarily

---

[4] *Casinos & Communities: Michigan*, AMERICAN GAMING ASSOCIATION (Aug. 9 2020), https://www.americangaming.org/resources/casinos-communities-michigan/ (last visited June 2, 2022).

[5] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT'L INST. HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last

spread through airborne transmission and cannot be removed from the air or entirely from many surfaces by way of routine surface cleaning.

25. Especially during the Policy Period and even now, the existence and presence of Coronavirus and COVID-19 are not completely reflected in reported cases or individuals' positive test results, as only a portion of the population has been tested. For example, in June 2020, the Centers for Disease Control and Prevention ("CDC") estimated that the number of people in the U.S. who had been infected with COVID-19 was ten times higher than the number of reported cases.[6] Additionally, it has been reported that at least 40% of people infected with COVID-19 are asymptomatic.[7] COVID-19 also has been found to include a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to other people, given that they release infectious droplets and aerosols

---

visited May 16, 2022), Ex. 2; Nathan Jeffay, *COVID proteins that trigger strokes and heart attacks identified by Israeli team*, TIMES ISR. (Nov. 3, 2021), https://www.timesofisrael.com/covid-pieces-that-trigger-strokes-and-heart-attacks-identified-by-israeli-team/?utm_source=dlvr.it&utm_medium=twitter (last visited May 16, 2022), Ex. 3.

[6] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported*, WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited May 16, 2022), Ex. 4.

[7] Ellen Cranley, *40% of people infected with Covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited May 16, 2022), Ex. 5.

into the air and onto surfaces without having experienced symptoms and without realizing that they are contagious or infected.[8]

26. Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry high levels of "viral load" during a period when they have no symptoms and therefore are unaware that they are infectious.[9] The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage or the infection is asymptomatic."[10]

---

[8] *See Coronavirus disease 2019 (COVID-19) Situation Report – 73*, WHO (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited May 16, 2022), Ex. 6; Minghui Yang et al., *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE MED. 3 (Feb. 1, 2021), https://www.atsjournals.org/doi/10.1164/rccm.202006-2136LE (last visited May 16, 2022), Ex. 7.

[9] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672-75, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited May 16, 2022), Ex. 8; Lirong Zou et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, NEW ENG. J. MED. 382, 1177-79 (Mar. 19, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2001737 (last visited May 16, 2022), Ex. 9.

[10] Seyed M. Moghadas et al., *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15 (July 28, 2020), https://www.pnas.org/content/117/30/17513 (last visited May 16, 2022), Ex. 10.

27. As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the source of new infections, also known as community transmission or community spread.

28. COVID-19 is highly contagious, uniquely resilient, and potentially deadly. The degree to which an infectious disease is contagious is measured by $R_0$, a term that defines the average number of other people who are likely to become infected by one person with that disease. The $R_0$ is a measure of the transmissibility of a pathogen and is determined by estimating the susceptibility of individuals in the population to disease, the transmissibility of the pathogen, and importantly, the likelihood and duration of contact between individuals in a population, a parameter that is directly determined by the physical properties of the environment in which contact occurs.[11] Studies have concluded that one person with COVID-19 could infect as many as 5.7 others ($R_0 \approx 5.7$), which is much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others ($R_0 \approx 1.3$).[12]

29. Coronavirus can remain infectious for "much longer time periods than

---

[11] Anthony R. Ives & Claudio Bozzuto, *Estimating and explaining the spread of COVID-19 at the county level in the USA*, 4 COMMC'NS BIOLOGY 60 (Jan. 5, 2021), https://www.nature.com/articles/s42003-020-01609-6 (last visited May 16, 2022), Ex. 11.

[12] M. Cevik et al., *COVID-19 pandemic-a focused review for clinicians*, 26 CLINICAL MICROBIOLOGY & INFECTION 7, 842-47 (July 1, 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited May 16, 2022), Ex. 12.

generally considered possible."[13]

30. The World Health Organization ("WHO") stated that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks…People can catch COVID-19 if they breathe in these droplets from a person infected with the virus…These droplets can land on objects and surfaces around the person such as tables, doorknobs, and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[14]

31. People infected with Coronavirus spread the virus not only from tiny droplets but also from aerosols expelled from their nose and mouth when they cough, sneeze, or speak. People become infected with Coronavirus and resultant COVID-19 disease if they breathe in these droplets or aerosols expelled by an infected person. Droplets and aerosols can be expelled in close proximity (one-to-two meters) or can be carried on air currents tens of meters.[15]

---

[13] Shane Riddell et al., *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited May 16, 2022), Ex. 13.

[14] *Q&A on coronaviruses (COVID-19)*, WHO (updated May 4, 2020), https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited May 16, 2022), Ex. 14.

[15] Lidia Morawska & Donald K. Milton, *It Is Time to Address Airborne Transmission of Coronavirus Disease 2019 (COVID-19)*, 71 CLINICAL

### C. Coronavirus and COVID-19 Cause Physical Loss of or Damage to Property

32. The omnipresence of Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne/aerosolized, and fomite transmission (the latter being transmission from surfaces and objects).[16] These transmission methods demonstrate that Coronavirus and COVID-19 cause physical loss of or damage to property.

#### 1. Respiratory Droplet/Airborne Transmission

33. The presence of Coronavirus in the air physically and materially alters and transforms the content of the room air as shown in the following illustrations which depict normal room air at the molecular level compared to room air infested with aerosolized Coronavirus at increasing concentration. Normal room air and room air infested with aerosolized Coronavirus are also compared to room air containing ammonia to depict the similarities in the physical and material alteration caused by aerosolized Coronavirus and ammonia, a substance that courts have held causes physical loss of or damage to property by impairing the functional use of the

---

INFECTIOUS DISEASES 9, 2311-13 (Dec. 3, 2020), https://pubmed.ncbi.nlm.nih.gov/32628269/ (last visited May 16, 2022), Ex. 15.

[16] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 16, 2022), Ex. 16.

property. As depicted, aerosolized Coronavirus causes the same physical loss of or damage to property caused by ammonia, smoke, soot, radon gas, asbestos, and other hazardous substances.

**Composition of Room Air – Normal vs. Ammonia vs. SARS-CoV-2 Over Time**




Composition of Room Air w/ Ammonia
Aerosol particles
Aerosol particle produced by breathing/speaking
Major gaseous components in air ($O_2$ and $N_2$)
Ammonia ($NH_3$)


Composition of Room Air w/ SARS-CoV-2 (10 minutes)
Aerosol particles
Aerosol particles produced by breathing/speaking
Major gaseous components in air ($O_2$ and $N_2$)
Infectious aerosol particles w/ SARS-CoV-2




34. Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[17] Respiratory transmission of Coronavirus is commonly divided into droplet (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission. Though convenient, this binary division is an oversimplification that underscores transmission risk.[18] Humans produce a wide range of particle sizes when coughing,

---

[17] *Id.*

[18] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020),

sneezing, talking, singing, or otherwise dispersing droplets, with virions predominating in the smallest particles.[19] Respiratory particles produced by the average person can travel almost 20 feet by sneezing.[20] An M.I.T. researcher has found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[21] A comprehensive review of viral, host, and environmental factors that affect Coronavirus transmission reported on the "abundant evidence" that proximity is a significant factor in measuring Coronavirus transmission risks.[22]

35. Airborne transmission involves the spread of the infectious agent caused by the dissemination of droplet nuclei (aerosols) from, for example, exhaled breath, that remain infectious when suspended in the air over long distances and time.[23] These tiny particles can remain suspended "for indefinite periods unless

---

https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited May 17, 2022), Ex. 17.

[19] *Id.*

[20] *Id.*

[21] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38 (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited May 16, 2022), Ex. 18.

[22] Eric A. Meyerowitz et al., *Transmission of SARS-CoV-2: A Review of Viral, Host, and Environmental Factors*, ANNALS INTERNAL MED. (Jan. 2021), https://www.acpjournals.org/doi/10.7326/M20-5008 (last visited May 16, 2022), Ex. 19.

[23] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18,

removed by air currents or dilution ventilation."[24] As a result, the risk of disease transmission increases substantially in enclosed environments, compared to outdoor settings.[25]

36. The airborne transmission of Coronavirus within buildings is depicted in the following illustrations:

---

1837-38 (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited May 16, 2022), Ex. 18; *see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME (Aug. 25, 2020), https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited May 16, 2022), Ex. 20; Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited May 16, 2022), Ex. 21; Wenzhao Chen et al., *Short-range airborne route dominates exposure of respiratory infection during close contact*, 176 BLDG. & ENV'T (June 2020), https://www.sciencedirect.com/science/article/pii/S0360132320302183 (last visited May 16, 2022), Ex. 22.

[24] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited May 16, 2022), Ex. 17.

[25] Muge Cevik et al., *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (Sept. 23, 2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited May 16, 2022), Ex. 23.



26

[26] Luis Almodóvar, *Breathing, speaking and shouting* (illustration), *in* Mariano Zafra & Javier Salas, *A room, a bar and a classroom: how the coronavirus is spread through the air*, EL PAÍS (Oct. 29, 2020), https://english.elpais.com/society/2020-10-28/a-room-a-bar-and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR1jmVExKaRBcT9-lUHc9RV-xBO-XIShPlFtZsdyn1ltCeoNEXwtV_YP4q0 (last visited May 16, 2022), Ex. 24.



[27]

[27] *How cough and sneeze droplets travel* (illustration), *in* Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (updated Sept. 21, 2020), https://www.usatoday.com/in-depth/news/2020/04/03/coronavirus-protection-how-masks-might-stop-spread-through-coughs/5086553002/ (last visited May 16, 2022), Ex. 21.



[28]

[28] *Coronavirus aerosols and droplets* (illustration), *in* Mariano Zafra & Javier Salas, *A room, a bar and a classroom: how the coronavirus is spread through the air*, EL PAÍS (Oct. 29, 2020), https://english.elpais.com/society/2020-10-28/a-room-a-bar-and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR1jmVExKaRBcT9-lUHc9RV-xBO-XIShPlFtZsdyn1ltCeoNEXwtV_YP4q0 (last visited May 16, 2022), Ex. 24.




29

29 *Major modes of transmission of respiratory viruses during short-range and long-range transmission* (illustration), *in* Nancy H.L. Leung, *Transmissibility and transmission of respiratory viruses*, 19 NATURE REVS. MICROBIOLOGY 8, 528-45 (Aug. 2021), https://www.nature.com/articles/s41579-021-00535-6 (last visited May 16, 2022), Ex. 25.



[30]

[30] *The Cycle of Property Damage by Persons with COVID-19 in Air and On Surfaces* (illustration), *in* Treasure Island, LLC's Motion to Amend Complaint, Exhibit K at 11, *Treasure Island, LLC v. Affiliated FM Ins. Co.*, No. 2:20-cv-00965-JCM-EJY (Mar. 8, 2021) (No. 85-2), Ex. 26.




WHO reported exposure mechanisms for COVID-19 SARS-CoV-2 droplets (dark blue color). Light blue color: airborne mechanism that is known from SARS-CoV-1 and other flu, currently there is no reported evidence specifically for SARS-CoV-2 (Credit: Francesco Franchimon – image from the REVHA COVID-19 Guidance Document(2)) [31]

[31] Francesco Franchimon, *image from REVHA COVID-19 Guidance Document(2)* (illustration), *in* Peter Rumsey et al., *COVID-19 and Office Building HVAC Responses*, PEI BLOG (updated July 8, 2020), https://www.pointenergyinnovations.com/covid-19-and-office-building-hvac-responses/ (last visited May 16, 2022), Ex. 27.

[32]




[32] *Microscopic View of 3D Spherical Viruses – stock photo* (illustration), *in The COVID-19 virus can spread through the air – here's what it'll take to detect the airborne particles*, CONVERSATION (Aug. 14, 2020), https://theconversation.com/the-covid-19-virus-can-spread-through-the-air-heres-what-itll-take-to-detect-the-airborne-particles-140149 (last visited May 16, 2022), Ex. 28.



[33]

37. Available videos demonstrate Coronavirus "aerosol clouds" lingering indoors in a supermarket, transmitting COVID-19, and rendering the business premises unsafe, uninhabitable, unfit for its normal and intended use or causing it to lose, in whole or in part, its functional use.[34]

38. The WHO and the scientific community have studied the spread of Coronavirus through aerosols in indoor settings via air circulation systems. For example, on April 5, 2021, the CDC concluded that:

- "[t]he principal mode by which people are infected with [Coronavirus] . . . is through exposure to respiratory droplets carrying infectious virus"; and

- "when a person with suspected or confirmed COVID-19

[33] Mikko Auvinen & Antti Hellsten (animation), Marie Szaniszlo, *Simulation shows how the coronavirus can spread in supermarkets*, BOSTON HERALD (updated Apr. 11, 2020), https://www.bostonherald.com/2020/04/09/simulation-shows-how-the-coronavirus-can-spread-in-supermarkets/ (last visited May 16, 2022), Ex. 29.

[34] *See e.g.*, David Mercer, *Coronavirus lingers in air longer than previously thought, scientists warn*, SKY NEWS (Apr. 10, 2020), https://news.sky.com/story/coronavirus-3d-model-reveals-how-covid-19-can-spread-in-supermarket-11971373 (last visited May 16, 2022), Ex. 30.

> has been indoors, virus can remain suspended in the air for minutes to hours."[35]

39. An investigation of over 7,000 COVID-19 cases found that all outbreaks involving three or more people occurred indoors.[36] The airborne Coronavirus viral RNA has been detected inside indoor spaces at distances over 50 meters from its source, and in crowded areas outside of buildings.[37]

40. Moreover, the CDC published a research letter concluding that a restaurant's air conditioning system triggered the transmission of Coronavirus, spreading it to people who sat at separate tables downstream of the restaurant's airflow.[38] Moreover, one study detected Coronavirus inside HVAC systems

---

[35] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited May 16, 2022), Ex. 31.

[36] Hua Qian et al., *Indoor transmission of SARS-CoV-2*, 31 INDOOR AIR 3, 639-45 (May 2021), https://pubmed.ncbi.nlm.nih.gov/33131151/ (last visited May 16, 2022), Ex. 32.

[37] Yuan Liu et al., *Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals,* 582 NATURE 7813, 557-60 (June 2020), https://pubmed.ncbi.nlm.nih.gov/32340022/ (last visited May. 17, 2022), Ex. 33.

[38] Jianyun Lu et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited May 16, 2022), Ex. 34; *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46, e415 (Nov. 30, 2020), https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e415 (last visited May 16, 2022), Ex. 35.

transmitted over 180 feet from its source.[39]

41. A systematic review of airborne transmission of Coronavirus corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments to decrease bioaerosol concentration and reduce Coronavirus' spread.[40]

42. Additionally, on May 7, 2021, the CDC issued a scientific warning of the risks of indoor airborne transmission of Coronavirus from aerosols at distances greater than six feet from the source, stating that "transmission of SARS-CoV-2 [i.e., Coronavirus] from inhalation of virus in the air farther than six feet from an infectious source can occur" and that:

> With increasing distance from the source, the role of inhalation likewise increases. Although infections through inhalation at distances greater than six feet from an infectious source are less likely than at closer distances, the phenomenon has been repeatedly documented under certain preventable circumstances. These transmission events have involved the presence of an infectious person exhaling virus indoors for an extended time (more than 15 minutes and in some cases hours) leading to virus concentrations in the air space sufficient to transmit infections to people more than 6 feet away, and in some cases to people

---

[39] Karolina Nissen et al., *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, SCI. REPS. 10, 19589 (Nov. 11, 2020), https://www.nature.com/articles/s41598-020-76442-2 (last visited May 16, 2022), EX. 36.

[40] Zahra Noorimotlagh et al., *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited May 16, 2022), EX. 37.

who have passed through that space soon after the infectious person left. Per published reports, factors that increase the risk of SARS-CoV-2 infection under these circumstances include:

- **Enclosed spaces with inadequate ventilation or air handling** within which the concentration of exhaled respiratory fluids, especially very fine droplets and aerosol particles, can build-up in the air space.

- **Increased exhalation** of respiratory fluids if the infectious person is engaged in physical exertion or raises their voice (e.g., exercising, shouting, singing).

- **Prolonged exposure** to these conditions, typically more than 15 minutes.[41]

43. The CDC has recommended "ventilation interventions" to help reduce exposure to airborne Coronavirus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[42] These and other remedial measures must be implemented, at high cost and extra expense, to mitigate loss and reduce the amount of Coronavirus present in the space and to make property marginally safer for its normal and intended use.

---

[41] *Scientific Brief: SARS-CoV-2 Transmission*, CDC (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fscience%2Fscience-briefs%2Fscientific-brief-sars-cov-2.html (last visited May 16, 2022), Ex. 38.

[42] *Ventilation in Buildings*, CDC (updated June 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited May 16, 2022), Ex. 39.

These extreme measures demonstrate that Coronavirus and COVID-19 cause direct physical loss of or damage to interior spaces. Even then, those interventions cannot be guaranteed to eliminate the aerosolized Coronavirus in an indoor space. Nor do they eliminate it immediately.

44. The inability to guarantee complete or immediate elimination of aerosolized Coronavirus in indoor spaces can be observed acutely by comparing the infection rates of "essential workers" with that of the general public. The CDC defines essential workers to be those who conduct "operations and services in industries that are essential to ensure the continuity of critical functions in the United States."[43]

45. After the first wave of mass business closures in March and April of 2020, employees of so-called "essential businesses" that were eventually allowed to re-open or operate at reduced capacities (i.e., essential workers) were faced with elevated rates of infection when compared to the general public, demonstrating the presence of Coronavirus in their workplaces, rendering the same unfit and unsafe for normal use (e.g., for people to be present therein).[44] For example:

---

[43] *See Interim List of Categories of Essential Workers Mapped to Standardized Industry Codes and Titles*, CDC (updated Mar. 29, 2021), https://www.cdc.gov/vaccines/covid-19/categories-essential-workers.html (last visited May 16, 2022), Ex. 40.

[44] Joanna Gaitens et al, *COVID-19 and Essential Workers: A Narrative Review of Health Outcomes and Moral Injury*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 4,

- One study found that 20% of essential grocery store workers tested positive for COVID-19, a much higher rate of infection than others in their surrounding communities[45] and that those grocery store workers with interactions with the public tested positive for COVID-19 at a rate five times greater than the general population.[46]

- Essential workers (e.g., liquor store employees) accounted for 87% of excess deaths in California[47] and over 60% in New York City.[48]

- Nursing home residents and employees accounted for at least 35% of all COVID-19 deaths in the United States.[49]

46. Similar findings have been reported across various sectors of essential workers, including elevated rates of infection for emergency services personnel (e.g.,

---

1446 (Feb. 4, 2021), https://www.mdpi.com/1660-4601/18/4/1446 (last visited May 16, 2021), Ex. 41.

[45] *Id.*

[46] Fan-Yun Lan et al., *Association between SARS-CoV-2 infection, exposure risk and mental health among a cohort of essential retail workers in the USA*, 78 OCCUPATIONAL ENV'T MED. 237-43 (Oct. 30, 2020), https://oem.bmj.com/content/oemed/78/4/237.full.pdf (last visited May 16, 2022), Ex. 42.

[47] Yea-Hung Chen et al., *Excess mortality associated with the COVID-19 pandemic among Californians 18-65 years of age, by occupational sector and occupation: March through November 2020*, 16 PLOS ONE 6, e0252454 (June 4, 2021), https://pubmed.ncbi.nlm.nih.gov/34086762/ (last visited May 16, 2022), Ex. 43.

[48] *The plight of essential workers during the COVID-19 pandemic*, 395 LANCET 1587 (May 23, 2020), https://www.thelancet.com/action/showPdf?pii=S0140-6736%2820%2931200-9 (last visited May 16, 2022), Ex. 44,

[49] Artis Curiskis et al., *Federal COVID Data 101: Working with CMS Nursing Home Data*, ATLANTIC (Mar. 4, 2021), https://covidtracking.com/analysis-updates/federal-covid-data-101-working-with-cms-nursing-home-data (last visited May 16, 2022), Ex. 45.

firefighters, police), prison correctional officers, and transportation and factory workers, among others.[50] These findings disprove arguments that Coronavirus does not affect the safety, usability, or functional use of property just because the government allowed businesses it determined were "essential" to remain open.

**2. Fomite (i.e., Surface and Object) Transmission**

47. COVID-19 may also be transmitted to people from physical objects, materials, or surfaces. "Fomites" are physical objects or materials that carry, and are capable of transmitting, infectious agents, altering these objects to become vectors of disease.[51] Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[52]

48. In addition, while fomite transmission may not be the primary transmission vector for COVID-19, fomite transmission is significant and in October 2020 was estimated to be responsible for up to 25% of all deaths due to COVID-19 since lockdowns were imposed.[53]

---

[50] *Id.*

[51] *Fomite*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/fomite (last visited May 16, 2022).

[52] P. Rusin et al., *Comparative surface-to-hand and fingertip-to-mouth transfer efficiency of gram-positive bacteria, gram-negative bacteria, and phage*, 93 J. APPLIED MICROBIOLOGY, 4, 585-92 (Sept. 18, 2002), https://pubmed.ncbi.nlm.nih.gov/12234341/ (last visited May 16, 2022), Ex. 46.

[53] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY &

49. The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites (contaminated surfaces). **Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be found on those surfaces for periods ranging from hours to days**, depending on the ambient environment (including temperature and humidity) and the type of surface, in particular at high concentration in health care facilities where COVID-19 patients were being treated. Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person . . . .[54] (Emphasis added).

50. In addition to studies cited by the WHO,[55] numerous other studies and scientific articles have discussed fomite transmission as a mode of virus transmission, including, but not limited to:

- A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping

---

INFECTION e257, 1-7 (Oct. 23, 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited May 16, 2022), Ex. 47.

[54] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 16, 2022), Ex. 16.

[55] *Id.*

mall in China.[56]

- A National Institutes of Health study published in the New England Journal of Medicine finding that Coronavirus survives up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel and suggesting that people may acquire the virus through the air and after touching contaminated objects.[57]

- An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (e.g., shaking a contaminated textile such as clothing or other merchandise).[58] According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."[59] Generally, frequently touched surfaces can become highly transmissive fomites.[60]

---

[56] Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 16, 2022), Ex. 48.

[57] *New coronavirus stable for hours on surfaces*, NAT'L INST. HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited May 16, 2022), Ex. 49.

[58] Stephanie A. Boone & Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 APPLIED & ENV'T MICROBIOLOGY 6, 1687-96 (Mar. 2007), https://aem.asm.org/content/73/6/1687 (last visited May 16, 2022), Ex. 50.

[59] *Id.*

[60] *Id.*

- A CDC research letter reporting that Coronavirus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[61]

- A Journal of Hospital Infection article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic for up to nine days.[62]

51. Importantly, Coronavirus has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic, and asymptomatic individuals.[63] Fomites are known to transform the surface of property into a potentially deadly Coronavirus transmission device.

52. As noted above, Coronavirus can remain infectious for a considerable length of time. For example, in the Journal of Virology, researchers demonstrated that Coronavirus could survive up to twenty-eight days at room temperature (68ºF)

---

[61] Boris Pastorino et al., *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited May 16, 2022), Ex. 51.

[62] G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSP. INFECTION 104, 246-51 (Feb. 6, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited May 16, 2022), Ex. 52.

[63] Minghui Yang et al., *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE MED. 3, 374-78 (Feb. 1, 2021), https://www.atsjournals.org/doi/pdf/10.1164/rccm.202006-2136LE (last visited May 16, 2022), Ex. 7.

on a variety of surfaces including glass, steel, vinyl, plastic, and paper.[64] A CDC report from March 27, 2020 stated that Coronavirus was identified on surfaces of the cabins on the Diamond Princess cruise ship seventeen days after the cabins were vacated but before they were disinfected.[65]

53. Numerous other scientific studies and articles have identified the persistence of Coronavirus on doorknobs, toilets, faucets, and other high-touch points, as well as on commonly overlooked surfaces such as floors.[66]

54. While the detection of viral RNA on surfaces or in the air does not necessarily mean that Coronavirus is subsequently present and infectious, it demonstrates that Coronavirus was in fact then present. Studies have demonstrated the transmission of laboratory-confirmed Coronavirus infection via surfaces.[67]

---

[64] *Id.*

[65] Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-52 (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited May 16, 2022), Ex. 53.

[66] Zhen-Dong Guo et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited May 17, 2022), Ex. 54.

[67] Nancy HL Leung, *Transmissibility and transmission of respiratory viruses*, 19 NATURE REVS. MICROBIOLOGY 8, 528-45 (Aug. 2021), https://pubmed.ncbi.nlm.nih.gov/33753932/ (last visited Mar. 11, 2022), Ex. 25; G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 J. HOSP. INFECTIONS 3, 246-51 (Mar.

### 3. These Modes of Transmission Cause Physical Loss of or Damage to Property

55. The presence of Coronavirus in and on property, including in the indoor air, on surfaces, and on objects, causes physical loss of or damage to property by physically and materially altering property and otherwise making it incapable of being used for its normal and intended purpose – just as if asbestos, ammonia, radon gas, cat urine, fumes, sulfuric gases emitted from Chinese drywall, carbon monoxide, mold, or salmonella were in the air or on surfaces of the premises.

56. Among other things, the presence of Coronavirus transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another. The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical and material alteration of property, describing viral droplets as "*creating* fomites (contaminated surfaces)."[68] "Creating" involves making or bringing into existence something

2020), https://pubmed.ncbi.nlm.nih.gov/32035997/ (last visited May 16, 2022), Ex. 52.

[68] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 16, 2022), Ex. 16 (emphasis added).

new[69] – such as something that is in an altered state from what it was before Coronavirus was present on, in and around the property.

57. Coronavirus adheres to surfaces and objects, physically and materially altering those objects by becoming a part of their surface and thereby making physical contact with them unsafe for their ordinary and customary use at that time. Once Coronavirus is in, on, or near property, it is easily spread by the air, people, and objects, from one area to another, causing additional physical loss of or damage to property.

58. Additionally, during the presence of the dangerous and potentially fatal Coronavirus in and on property, including in indoor air, on surfaces, and on objects, the property is unsafe, uninhabitable, and unfit for its normal and intended use or it suffers a loss, in whole or in part, of its functional use. This is because respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenantable, uninhabitable, and unfit for normal use or cause the loss, in whole or in part, of their functional use.

59. In addition to being found in air samples,[70] Coronavirus remains stable

[69] *See, e.g.*, *Create*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/create (last visited May 16, 2022), Ex. 55.

[70] Zhen-Dong Guo et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*,

in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[71]

### D. Coronavirus Cannot be Removed or Eliminated by Routine Cleaning and the Repeated Reintroduction of it Into Business Premises Remaining Open to the Public Renders Cleaning and Disinfection of it Less Effective

60. Coronavirus cannot be removed by routine surface cleaning.

61. In fact, the CDC released guidance stating that there is little evidence to suggest that routine use of disinfectants can prevent the transmission of Coronavirus from fomites in community settings.[72] The CDC concluded that, according to a more quantitative microbial risk assessment study, "surface disinfection once- or twice-per-day had little impact on reducing estimated risks" of Coronavirus transmission.[73]

---

26 EMERGING INFECTIOUS DISEASES 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited May 17, 2022), Ex. 54.

[71] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited May 16, 2022), Ex. 56.

[72] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited May 16, 2022), Ex. 31.

[73] *Id.* (citing A. K. Pitol & T. R. Julian, *Community transmission of SARS-CoV-2 by fomites: Risks and risk reduction strategies*, ENV'T SCI. & TECH. LETTERS 8, 263-69 (2021), Ex. 57).

62. A number of studies have similarly demonstrated that Coronavirus is "much more resilient to cleaning than other respiratory viruses so tested."[74] The measures that must be taken to attempt to remove and disinfect Coronavirus from property are significant and depend on the concentration of Coronavirus and a myriad of surface characteristics (e.g., type of surface, temperature, porosity) and extend far beyond ordinary or routine cleaning.

63. The efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, surface porosity, contact time with the decontaminating agent, dilution, temperature, and pH, among many others. It has been reported that no studies have investigated the efficacy of surface cleaning (with soap or detergent not containing a registered disinfectant) for reducing concentrations of Coronavirus on non-porous surfaces.[75] However, in one study, detergent surfactants were not recommended as single agents but rather in conjunction with other complex disinfectant solutions.[76]

---

[74] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited May 16, 2022), Ex. 56.

[75] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited May 17, 2022), Ex. 31.

[76] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510

64. Additionally, unlike cleaning a visible substance such as dust, Coronavirus is invisible to the naked eye, making it challenging to accurately determine the efficacy of decontaminating agents and how "clean is clean" or if surface disinfection is even effective. Moreover, the toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[77]

65. To be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" conditions amid a widespread wave of pervasive Coronavirus spread, where treated surfaces or objects may not undergo uniform exposure or adequate contact time.[78] Indeed, studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[79]

66. When considering disinfection and decontamination, the safety of

---

(June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited May 17, 2022), Ex. 56.

[77] *Id.*

[78] *Id*.

[79] Joon Young Song et al., *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-55 (Dec. 2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited May 17, 2022), Ex. 58.

products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[80]

67. With respect to textiles (e.g., bedding and towels) – exceedingly common items at the MotorCity complex – studies have demonstrated that virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[81]

68. Many of the surfaces and materials discussed in the studies and articles cited above are used throughout the MotorCity complex and are part of its daily operations, including plastics, glass, metals, cloth and fabrics such as blankets. Similarly, these surfaces and materials are used in virtually all business and tourist amenities throughout the City of Detroit and State of Michigan, including at the Attraction Properties (as elsewhere herein defined) that attract customers to MotorCity.

69. Studies have demonstrated that even extraordinary cleaning measures

---

[80] *Id.*

[81] Lucy Owen & Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE & ENV'T e9790, 1-35 (Aug. 25, 2020), https://peerj.com/articles/9790/ (last visited May 17, 2022), Ex. 59.

do not remove Coronavirus from surfaces. For example, a 2021 study by the largest hospital network in New York State demonstrated that even *after* trained hospital personnel used disinfection procedures in Coronavirus patient treatment areas, much of the virus *survived* in those areas – proving even intense, non-routine surface cleaning does not remove it from surfaces – let alone from the air.[82]

70. Given the inadequacy of conventional cleaning procedures, and in response to the physical loss of or damage to property at the MotorCity complex caused by the presence of Coronavirus and COVID-19 on surfaces, disinfection and decontamination measures have included, but are not limited to, the use of chemicals such as aerosol foggers and surface disinfectants intended to perform deep disinfection, increasing frequency of cleanings at the MotorCity complex, and the removal and disposal of porous materials like bedding, towels, and other fabrics, all performed at great cost and expense to Detroit Entertainment and other property owners.

71. None of the above-referenced surface cleaning measures, however, remove Coronavirus from the room air. And, in fact, many actually exacerbate the damage to the room air. Aerosolized Coronavirus particles and virions specifically

[82] Zarina Brune et al., *Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (Mar. 3, 2021), https://www.mdpi.com/1660-4601/18/5/2479 (last visited May . 17, 2022), Ex. 60.

cannot be eliminated by routine surface cleaning, and routine cleaning methods have been shown to make the aerosolization situation worse, given that, in some cases the cleaning of contaminated surfaces (i.e., floors) could reasonably result in re-aerosolization of Coronavirus.

72. Cleaning Coronavirus from surfaces in an indoor space will not remove aerosolized Coronavirus particles from the indoor air any more than cleaning friable asbestos particles that have landed on a surface will remove the friable asbestos particles suspended in the air. In each case, people can inhale and become infected with Coronavirus or develop asbestos-related diseases.

73. Moreover, given the ubiquity and pervasiveness of Coronavirus, no amount of cleaning or ventilation intervention or even the dissipation of Coronavirus with the passage of time, will prevent a person who enters an indoor space while infected with Coronavirus from exhaling millions of additional Coronavirus droplets and infectious aerosols into the air, thereby further: (a) filling the room air and physically and materially altering it with aerosolized and hazardous Coronavirus that can be inhaled; and (b) depositing infectious Coronavirus droplets on the surfaces, physically and materially altering and transforming those surfaces into disease-transmitting fomites.

74. Stated differently, the repeated reintroduction of Coronavirus by infectious persons into a publicly open indoor space renders cleaning, ventilation

interventions and even dissipation over time less effective. None of these things, while they may mitigate the situation temporarily, will completely eliminate the presence of Coronavirus.

75. Thus, during the Policy Period, Detroit Entertainment was not able to completely remove or eliminate Coronavirus from its property with routine or even extraordinary cleaning, disinfection, or dissipation measures.

### E. Coronavirus and COVID-19 Impact Detroit, the State of Michigan and the Gaming Industry

76. Michigan experienced a reported COVID-19 outbreak in the middle of March 2020, and the Detroit area became an epicenter of sickness, death and property damage caused by Coronavirus and COVID-19.[83]

77. On March 10, 2020, Governor Gretchen Whitmer announced the first presumptive positive cases of COVID-19 in the state, involving patients in Wayne and Oakland Counties.[84] Governor Whitmer declared a state of emergency.[85] The

[83] Julie Mack, *Michigan has become a U.S. epicenter for coronavirus. Why?*, MLIVE (Mar. 27, 2020), https://www.mlive.com/public-interest/2020/03/michigan-has-become-a-us-epicenter-for-coronavirus-why.html (last visited May 26, 2022).

[84] *Michigan announces first presumptive positive cases of COVID-19*, MICHIGAN.GOV (Mar. 10, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521365--,00.html (last visited May 26, 2022).

[85] *Id.*

first death was reported in Michigan on March 18, 2020, and involved a man in Wayne County, the county in which MotorCity is located.[86] By mid-March 2020, Coronavirus and COVID-19 had spread rapidly throughout the area, with numerous new infections and deaths reported daily, as well as the closure of businesses and cancellation of events.[87] The outbreak of COVID-19 was so severe in Detroit that only the New York and New Orleans metropolitan areas surpassed metro Detroit in cases per capita.[88] As Detroit-area epidemiologists observed in March 2020: "Southeast Michigan is pretty much exploding with exponential growth of COVID patients[.]"[89]

78. Coronavirus and COVID-19 have caused widespread physical loss of or damage to property in the Detroit area and throughout Michigan, including

---

[86] Kristen Jordan Shamus et al., *First Mich. Death due to coronavirus is Southgate man in his 50s*, DETROIT FREE PRESS (Mar. 18, 2020), https://www.freep.com/story/news/local/michigan/wayne/2020/03/18/coronavirus-deaths-michigan/5054788002/ (last visited May 26, 2022).

[87] *See, e.g.*, Lauren Gibbons, *Michigan coronavirus timeline: It's been four weeks since state's first confirmed case*, MLIVE (Apr. 7, 2020), https://www.mlive.com/public-interest/2020/04/michigan-coronavirus-timeline-its-been-four-weeks-since-states-first-confirmed-case.html (last visited May 26, 2022).

[88] Julie Mack, *Michigan has become a U.S. epicenter for coronavirus. Why?,* MLIVE (Mar. 27, 2020), https://www.mlive.com/public-interest/2020/03/michigan-has-become-a-us-epicenter-for-coronavirus-why.html (last visited May 26, 2022).

[89] *Id.*

property owned by Detroit Entertainment and property in nearby locations and businesses within one mile of MotorCity that attract customers and patrons to MotorCity (referred to as "Attraction Properties" in the Policy). These Attraction Properties include, among other things, downtown Detroit office buildings, sports and theater venues, stores, restaurants, and the like.

79. As a result, Detroit Entertainment, along with the overall hotel and gaming industry, was forced to close its facilities or operate with capacity limitations and other restrictions. Simply put, the physical loss of or damage to Detroit Entertainment's and the gaming and hospitality industry's properties have negatively impacted sales and severely harmed hotel companies and casino operators across the nation.

80. The physical loss of or damage to property due to Coronavirus and COVID-19 and its impact on Detroit and Michigan have been devastating. As of May 24, 2022, Michigan has reported a total of 2,501,863 COVID-19 cases, including 36,718 deaths.[90] Detroit has been particularly hard hit, and as acknowledged by the Detroit Health Department, long-standing systemic health and social inequities have put the city's predominantly African American population at

[90] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, CDC (updated May 25, 2022), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited May 26, 2022).

increased risk of getting sick and dying from COVID-19.[91]

81. The City of Detroit's hard times are well known, but the city is determined to turn the corner, in reliance on the business and philanthropic activities of companies like Detroit Entertainment. The widespread physical loss of or damage to property throughout Detroit and Michigan caused by Coronavirus and COVID-19 have been disastrous for businesses like Detroit Entertainment and the thousands of Detroiters they employ.

82. Detroit was hit particularly hard by the closure of all three of its casinos as a result of Coronavirus and COVID-19. Casino wagering taxes comprise approximately 16% of Detroit's general fund revenue and are the city's third largest revenue source.[92] For the first six months of calendar year 2020, Detroit collected only $5.6 million in wagering taxes from its three casinos compared to $86 million in the first six months of 2019.[93] The State of Michigan likewise felt the economic

---

[91] *Emergency Order for Control of Epidemic*, DETROIT HEALTH DEP'T (Oct. 9, 2020), https://detroitmi.gov/sites/detroitmi.localhost/files/2020-10/Executed%20Public%20Health%20Order%20DZF%2010-09-2020%20FINAL.PDF (last visited May 26, 2022).

[92] JC Reindl, *Closed casinos are huge loss for Detroit: How much it could hurt*, DETROIT FREE PRESS (updated May 27, 2020), https://www.freep.com/story/news/local/2020/05/27/closed-casinos-huge-loss-detroit/5236641002/ (last visited May 26, 2022).

[93] David Caraviello, *Detroit Casino Revenue Declines 59% In First Half Of 2020*, TOPUSCASINOS.COM (July 15, 2020), https://www.topuscasinos.com/news/detroit-casino-revenue-declines-59-in-first-half-of-2020 (last visited May 26, 2022).

sting of the closures of casinos. During 2020, the three Detroit casinos paid $50.3 million in wagering taxes to the state compared with $117.8 million in wagering taxes paid in 2019.[94]

83. The hotel and gaming industries have been severely impacted by the economic devastation caused by the physical loss of or damage to property from Coronavirus and COVID-19.

84. In March 2020, the American Gaming Association predicted it would cost the U.S. economy $21.3 billion in direct consumer spending if casinos stayed closed for eight weeks.[95] According to a February 2021 report, 989 casinos in the United States closed because of the widespread nature of Coronavirus and COVID-19, which led to approximately 650,000 employees being furloughed or terminated.[96] As a result, $105 billion in economic activity was lost across the

---

[94] *Detroit casinos produce nearly $639 million in aggregate revenue during 2020*, MICH. GAMING CONTROL BD. (Jan. 12, 2021), https://www.michigan.gov/mgcb/0,4620,7-351-79263-549300--,00.html#:~:text=Detroit%20casinos%20produce%20nearly%20%24639%20million%20in%20aggregate%20revenue%20during%202020,-Contact%3A%20Mary%20Kay&text=Detroit%2C%20Jan.&text=Table%20games%20and%20slots%20generated,percent%20compared%20with%202019%20result (last visited May 26, 2022).

[95] Alex Gangitano, *Casino industry estimates $21B in economic losses from coronavirus*, HILL (Mar. 19, 2020), https://thehill.com/business-a-lobbying/business-a-lobbying/488411-casino-industry-estimates-21b-in-economic-losses-from (last visited May 26, 2022).

[96] Erik Gibbs, *US gaming industry hit hard by COVID-19, but gave overwhelming support*, CALVINAYRE (Feb. 2, 2021),

country, and the first 11 months of 2020 saw a total decrease of 32% in gaming revenue compared to the same period a year earlier.[97] In April 2020, the Wall Street Journal predicted casino companies would lose a staggering $39 billion in the following 12 to 18 months.[98]

85. Similarly, in April 2020, the American Hotel & Lodging Association released new data demonstrating the impact of Coronavirus and COVID-19 on the travel industry. To provide some perspective, the losses were nine times worse than 9/11, with forecasted occupancy rates for 2020 worse than the Great Depression.[99] As of February 2021, hotel revenue and hotel employee salaries were down a staggering $2.8 billion and $1.7 billion per week, respectively, with projections indicating that the total revenue loss for 2020 exceeded 50%.[100]

---

https://calvinayre.com/2021/02/02/casino/us-gaming-industry-hit-hard-by-covid-19-but-gave-overwhelming-support/ (last visited May 26, 2022).

[97] *Id.*

[98] Katherine Sayre, *In Las Vegas, Coronavirus Job Losses Could Double Those of 2007-2009 Recession*, WALL ST. J. (Apr. 9, 2020), https://www.wsj.com/articles/in-las-vegas-coronavirus-job-losses-could-double-those-of-2007-09-recession-11586433601 (last visited May 26, 2022).

[99] *New Report Shows Severity of COVID-19 Impacts on Hotel Industry*, NIAGRA FRONTIER PUBL'NS (Apr. 24, 2020), https://www.wnypapers.com/news/article/current/2020/04/24/141176/new-report-shows-severity-of-covid-19-impacts-on-hotel-industry (last visited May 26, 2022).

[100] Hannah Madison, *COVID-19's Negative Impact on the Restaurant and Hospitality Industry*, MD. REP. (Feb. 25, 2021),

### F. Coronavirus Was Present at MotorCity and at Detroit Entertainment's Attraction Properties

86. The CDC keeps track of known infections by county. Wayne County, where the MotorCity complex is located, has been a hotspot and epicenter of COVID-19 infections in Michigan.

87. Michigan and the Detroit area became an epicenter of COVID-19 outbreaks in mid-and late March 2020.[101] Indeed by May 31, 2020, Michigan had 63,568 reported cases of COVID-19.[102]

88. The presence of Coronavirus at the MotorCity complex, as well as at the Attraction Properties, was certain. This can be confirmed with certainty or near-certainty by statistical modeling based on the known incidences of infection, despite the lack of commercially available tests for air or surface presence of Coronavirus, and despite the shortage of either rapid or laboratory COVID-19 tests and testing sites that could have otherwise resulted in testing being administered to every

---

https://marylandreporter.com/2021/02/25/covid-19s-negative-impact-on-the-restaurant-and-hospitality-industry/ (last visited May 26, 2022).

[101] Julie Mack, *Michigan has become a U.S. epicenter for coronavirus. Why?*, MLIVE (Mar. 27, 2020), https://www.mlive.com/public-interest/2020/03/michigan-has-become-a-us-epicenter-for-coronavirus-why.html (last visited May 17, 2022).

[102] *The COVID Tracking Project, Michigan: Cases*, ATLANTIC (updated Mar. 7, 2021), https://covidtracking.com/data/state/michigan/cases (last visited May 21, 2022).

individual who was on-site at the relevant times.[103]

89. Since the emergence of COVID-19 in March 2020, over 620 MotorCity employees have reported to Detroit Entertainment that they have contracted COVID-19.

90. Given the high percentage of asymptomatic cases of COVID-19, it is certain the actual number of MotorCity employees who have contracted COVID-19 was substantially greater than the number of employees known to have contracted COVID-19.

91. The above is direct proof of the actual, certain presence of Coronavirus at Detroit Entertainment's property, i.e., in, or around, the MotorCity complex.

92. Additionally, given that Coronavirus is highly contagious, the global pervasive status of COVID-19, its heavy toll throughout Michigan, and the heavily trafficked common areas in and around the MotorCity complex, it is statistically certain or near-certain that many other individuals at or in the vicinity of the MotorCity complex contracted and carried Coronavirus.

93. Moreover, the high number of COVID-19 deaths indicates a

---

[103] *See, e.g.,* Aroon Chande et al., *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NATURE HUM. BEHAV. 1313-19 (Nov. 9, 2020), https://www.nature.com/articles/s41562-020-01000-9 (last visited May 17, 2022), Ex. 64.

significantly higher number of cases than those confirmed by COVID-19 tests.[104]

94. The infection fatality rate ("IFR") for COVID-19, defined as the proportion of individuals who die of the disease among all infected individuals, varies by age, as shown in the table below.[105]

| **Age** | **Proportion of U.S. Population (2010)**[106] | **Proportion of Wayne County (2010)**[107] | **IFR** | **Infections Per Death** |
|---|---|---|---|---|
| 0-17 | 0.24 | 0.236 | 0.00002 | 50,000 |
| 18-49 | 0.44 | 0.410 | 0.0005 | 2,000 |
| 50-64 | 0.19 | 0.196 | 0.006 | 167 |
| 65+ | 0.13 | 0.158 | .09 | 11 |

95. In the U.S., the average IFR across all age demographics represented in the table above (taking into account each category's proportion to the population as a whole) is 0.013, meaning that there is approximately one death for every 77

[104] Andrew T. Levin et al., *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications*, 35 EUR. J. EPIDEMIOLOGY 12, 1123-38 (Dec. 8, 2020), https://pubmed.ncbi.nlm.nih.gov/33289900/ (last visited May 17, 2022), Ex. 61.

[105] *COVID-19 Pandemic Planning Scenarios*, CDC (updated Mar. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited May 18, 2021). Ex. 62. Results reproduced from Table 1 (current best estimate).

[106] *Age and Sex Composition: 2010*, U.S. CENSUS BUREAU, at 2 tbl.1 (May 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf (last visited May 18, 2021).

[107] Population by Sex and Selected Age Groups: 2000 and 2010 (May 2011), www.census.gov/prod/cen2010/briefs/c2010br-03.pdf) (last visited May 18, 2021).

infections. The death toll in the U.S. attributable to Coronavirus and COVID-19 stood at 554,929 through April 5, 2021.[108] That statistic, however, corresponds to 42,478,281 cases, which is significantly larger than the 30.7 million cases confirmed through testing.[109]

96. The IFR is a statistical quantity estimated from data using seroprevalence studies.[110] As more data become available, the accuracy of the estimation continues to improve. Current estimates of IFR used by the CDC come from peer-reviewed statistical analyses using data from 27 studies and 34 locations,[111] and account for the range of uncertainty of IFR estimates according to best standards of statistical practice.

97. The IFR estimates can vary by county based on age demographics. Specifically, the COVID-19 IFR for Wayne County, MI is estimated to be 0.0156

---

[108] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES (updated May 26, 2021), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 26, 2022).

[109] *Id.*

[110] Seroprevalence studies use blood tests to identify people in a population who have antibodies against Coronavirus. *See Large-scale Geographic Seroprevalence Surveys*, CDC (updated Oct. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/geographic-seroprevalence-surveys.html (last visited May 26, 2022), Ex. 63.

[111] Andrew T. Levin et al., *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications*, 35 EUR. J. EPIDEMIOLOGY 12, 1123-38 (Dec. 8, 2020), https://pubmed.ncbi.nlm.nih.gov/33289900/ (last visited May 26, 2022), Ex. 61.

using the above table, which means that each death in Wayne County corresponds to about 64.1 cases. Accounting for uncertainty in IFR estimation gives a plausible range of variation in Wayne County between 0.0117 (corresponding to 85.4 cases for each death) to 0.0195 (corresponding to 51.2 cases for each death). These numbers are based on uncertainty reported by a peer-reviewed multi-location, multi-study meta-analysis.[112] A meta-analysis is a quantitative statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance.[113]

98. Using deaths recorded in Wayne County with the IFR, an estimate can be created and used to reliably demonstrate the proportion of persons in the Wayne County population who were infectious with COVID-19 on a particular day in 2020. This metric, also known as "daily prevalence", varied over 2020, with maximum daily prevalence in Wayne County reaching 2.9%, and a plausible range of variation from 2.3% to 3.8%. Simply put, the greater the daily prevalence of COVID-19, the more widespread the disease and Coronavirus were among the population.

99. The high prevalence of infectious COVID-19 cases makes it statistically certain or near-certain that Coronavirus droplets and aerosols were

---

112 *Id.*

113 *Meta-analysis*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/meta-analysis (last visited May 21, 2022).

dispersed repeatedly into the air and on the property in, on and around the MotorCity complex, rendering routine cleaning even less effective at removing Coronavirus from surfaces at Detroit Entertainment's property and completely ineffective at fully removing aerosolized Coronavirus particles and virions from the air inside the property. This was also the case at a myriad of business and tourist destinations throughout the state, including at the Attraction Properties. And the repeated reintroduction of Coronavirus into the MotorCity complex made attempts to clean, disinfect or dissipate Coronavirus from those properties less effective.

100. Between March 1, 2020, and December 31, 2020, the MotorCity complex had 1,659,759 patron visits. Correlating that number to the prevalence of infectious cases in Wayne County is telling: during this period MotorCity's complex experienced an estimated 4,188.1 visits from customers infectious with COVID-19, with a plausible range of variation from 3,350.5 to 5,584.1.

101. In plain English, during each of the 131 days when the MotorCity complex was opened to the public between March 1, 2020 and December 31, 2020, the MotorCity complex experienced an average of 32.0 visits by customers infectious with COVID-19, with a plausible range of variation from 25.6 to 42.6 such visits per day.

102. Early in the course of Coronavirus and COVID-19, testing was limited,

and thus potentially thousands more people were infected than were reported.[114] National and local incidence and prevalence rates clearly demonstrated the high magnitude of COVID-19 infections (and deaths) and the pervasiveness of Coronavirus throughout the Detroit area. Moreover, deaths recorded in Detroit point to a much higher prevalence of infectious cases than the number of positive COVID-19 tests actually reported in the area, and reliable statistical models have established with certainty or high probability that Coronavirus was present in the MotorCity complex.

103. Epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[115] The percent positive is a crucial indicator to determine whether a business can safely remain open. As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before re-opening.[116]

---

[114] *See, e.g.*, Benedict Carey & James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. TIMES (updated July 6, 2020), https://nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited May 17, 2022), Ex. 65.

[115] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive,"* JOHNS HOPKINS BLOOMBERG SCH. PUB. HEALTH (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited May 17, 2022 ), Ex. 66.

[116] *Id.*

104. As of late March 2020, the positivity rates in Detroit were higher than 5%.

105. Detroit presents a powerful example of how statistical modeling confirms the presence of Coronavirus at the MotorCity complex (in addition to its certain presence as demonstrated by the number of MotorCity employees who reported contracting COVID-19), and the large number of guests visiting the property during the time Coronavirus was actively spreading around the Detroit area.

106. As of March 20, 2020, Detroit was experiencing a 7-day positivity average of 43.8%, a rate that would remain high, reaching a 7-day positivity average of 64.4% as of April 2, 2020.

107. The above positivity rates indicate uncontrolled community spread of Coronavirus and its presence in the MotorCity complex in the months of March and April 2020.[117]

108. The Detroit Health Department has also recognized the severe impact of COVID-19 on the city's African American population, acknowledging that "Detroit residents are predominantly African American . . . and the Centers for Disease Control and Prevention has stated, '[l]ong-standing systemic health and

---

[117] *COVID-19 Dashboard*, DETROIT HEALTH DEP'T (updated May 18, 2022), https://codtableau.detroitmi.gov/t/DHD/views/CityofDetroit-PublicCOVIDDashboard/TestsbyDate?%3AisGuestRedirectFromVizportal=y&%3Aembed=y (last visited May 21, 2022).

social inequities have put many people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19.'"[118]

### G. The Presence of Coronavirus in the Indoor Air of the MotorCity Complex as Well as on Surfaces Caused the Physical Loss of or Damage to the MotorCity Complex by Physically and Materially Altering the Air and the Surfaces of the Complex as Well as Causing the Loss, in Whole or in Part, of the Functional Use of the Facilities

109. Based on the prevalence (ratio of infected persons in a population) and incidence (ratio of new cases) of COVID-19 infections in the U.S., the MotorCity complex was repeatedly and continuously exposed to, invaded by, actually physically damaged and physically and materially altered by the presence of the airborne Coronavirus from infected patrons and employees, some of whom would have been asymptomatic and unknowing spreaders of Coronavirus. Coronavirus can be released into the air when infected persons breathe, talk, cough, sneeze, or sing, and such releases can infiltrate ventilation systems, as well as myriad surfaces (i.e., fomites), such as dermal contact surfaces (e.g., door handles, carpeting, bedding, gaming tables, electronic gaming machines, currency, chips, dice, restroom faucets, elevator buttons, tables, linens, silverware, etc.). Coronavirus has deposited, and continues to deposit, and therefore elevate contagion risks on, myriad dermal contact

---

[118] *Emergency Order for Control of Epidemic*, DETROIT HEALTH DEP'T (Oct. 9, 2020), https://detroitmi.gov/sites/detroitmi.localhost/files/2020-10/Executed%20Public%20Health%20Order%20DZF%2010-09-2020%20FINAL.PDF (last visited May 26, 2022), Ex. 67.

surfaces, which are transformed into disease-spreading fomites. These fomites can pose transmission risks for persons contacting those surfaces.

110. It is undisputed that air within a property laden with asbestos fibers is unsafe for people. It is no different for a property that has Coronavirus physically invading and physically and materially altering its air – the building has been damaged because the virus invades and physically and materially alters and transforms the air, which would have the effect of making it unsafe for breathing.

111. The introduction of Coronavirus into the indoor air at the MotorCity complex directly and physically and materially changes, alters, and transforms the composition of the air – such that it would then contain a concentration of SARS-CoV-2 particles and virions (whereas before it did not). The presence of Coronavirus in the air of the MotorCity complex physically and materially alters and transforms indoor air on the property. And the presence of Coronavirus impairs the functional use of the property in the same manner as the presence of any other hazardous, toxic or noxious substance would, causing the physical loss of or damage to the property.

112. As with asbestos in the air, the presence of an unsafe agent, such as Coronavirus, in the air of the premises alone results in risk. In fact, the risk of death due to exposure to Coronavirus is orders of magnitude higher than the risk of death due to exposure to asbestos. Indeed, recent estimates indicate that approximately

2,600 Americans die from asbestos exposure (mesothelioma) per year, compared with over 459,000 deaths of Americans due to Coronavirus exposure in 2021.[119] It is undisputed that the air within a property filled with asbestos fibers is unsafe for people. The same is true for a property whose air is filled with carbon monoxide or smoke. It is no different for a property that has Coronavirus – an external force – physically invading and physically and materially altering its air space; in fact, Coronavirus is exponentially more deadly than exposure to asbestos fiber, carbon monoxide, ammonia or smoke.

113. Because of its repeated reintroduction into the indoor air of a business premises remaining open to the public, Coronavirus is far worse than asbestos fiber, carbon monoxide, ammonia or smoke which, once removed by cleaning, dissipation or physical removal, typically do not continuously return to the premises.

### H. The Suspension and Interruption of Business at MotorCity Complex

114. MotorCity closed to the general public on March 16, 2020, although its hotel remained open on a limited basis to house certain utility company critical workers. MotorCity reopened its casino and certain other amenities on August 5, 2020, with extensive health and safety protocols that limited the number of guests

---

[119] Rengyi Xu et al., *Association between mesothelioma and non-occupational asbestos exposure: systematic review and meta-analysis*. 17 ENV'T HEALTH 1, 90 (Dec. 19, 2018), https://ehjournal.biomedcentral.com/articles/10.1186/s12940-018-0431-9 (last visited May 26, 2022), Ex. 68.

who could patronize the casino, but that were intended to make the casino as safe as possible for both MotorCity's employees and customers. MotorCity closed again at the end of the day on November 17, 2020. It reopened partially on December 23, 2020, with an even greater limitation on the number of guests who could patronize the casino. Detroit Entertainment has resumed operations of its various amenities at the MotorCity Complex, with the exception of casino valet parking and dining at the fine dining restaurant Iridescence (which is now part of the casino's banquet space), but with operational adjustments, including limitations on hours of operation.

115. As of April 1, 2020, nearly all of Detroit Entertainment's then 2,600-plus employees had been placed on furlough, and many were ultimately laid off. As of January 2021, over 1,100 employees had not been returned to work.

116. These closures and events were a result of direct physical loss of or damage to property caused by Coronavirus and COVID-19, and as a result of the loss of the ability to operate MotorCity in its normal and customary manner. Also, during this time, Michigan Governor Whitmer, the Michigan Department of Health and Human Services ("MDHHS"), and various local health departments issued numerous emergency civil authority orders addressing the health and public safety crisis caused by Coronavirus and COVID-19, including orders that closed and restricted certain businesses and activities, prohibited or limited gatherings, and required Michigan residents to stay home.

117. These civil authority orders were issued for a number of reasons, including physical loss of or damage to property caused by Coronavirus and COVID-19; the ability of Coronavirus and COVID-19 to be transmitted through aerosols and fomites; and the ability of Coronavirus to survive on surfaces for days, linger in indoor air, and transform air and surfaces into vehicles of virus transmission, which would render property unsafe for normal use.

118. The presence of Coronavirus and COVID-19 in, on, and near the MotorCity complex therefore caused and continues to cause direct physical loss of or damage to Detroit Entertainment's property and that of its Attraction Properties, resulting in business income loss covered under the Policy.

119. As a result of this direct physical loss of or damage to Detroit Entertainment's property, Detroit Entertainment closed and/or limited the operations of its casino and other amenities, incurred extra expense, undertook costly efforts to protect and preserve property from further damage or loss, and operated at reduced capacities, all resulting in losses above $270 million.

## I. Civil Authority Orders Interrupted Detroit Entertainment's Operations – Forcing its Closures and Then Severely Restricting its Operations

120. On March 16, 2020, the CDC and the national Coronavirus Task Force issued guidance to the American public titled "30 Days to Slow the Spread" of COVID-19. The guidance called for restrictive social distancing measures, such as

working from home, avoiding gatherings of more than 10 people and staying away from bars and restaurants.[120]

121. State and local governments across the nation recognized the unprecedented and mushrooming outbreaks of COVID-19 and Coronavirus's catastrophic impact through direct physical loss of or damage to property and lives. As a consequence, many states issued "State of Emergency" Declarations in early March 2020. Within a short time, the State of Michigan and the Michigan Gaming Control Board ("MGCB") followed suit and issued orders suspending or severely limiting business operations where people could potentially contract COVID-19. This included Detroit's casinos, as well as other aspects of Detroit Entertainment's business. The governmental orders described in this section affecting Detroit Entertainment's business are referred to collectively herein as the "Civil Authority Orders."

122. The Civil Authority Orders were issued as a consequence of the physical loss of or damage to property in Michigan and Detroit, including to the many buildings and properties within three miles of the MotorCity complex, caused

---

[120] *The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread*, WHITE HOUSE & CDC (Mar. 16, 2020), https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited May 17, 2022).

by the pervasive presence of Coronavirus in the indoor air and on the surfaces of these properties, which physically and materially altered them, caused actual physical damage to them, and rendered them uninhabitable, unsafe or otherwise unfit for their normal and intended uses and caused, in whole or in part, their loss of functional use.

123. These Civil Authority Orders prohibited access to the casino and certain other portions of the MotorCity complex. Although Detroit Entertainment paid massive premiums to AGLIC to provide coverage for its use of the casino for gaming operations, AGLIC never offered to refund and never refunded any of those premiums to Detroit Entertainment after the Civil Authority Orders' mass prohibition of access to the casino for those operations – the heart of Detroit Entertainment's business and the basis for those massive premiums it paid to AGLIC.

124. Among other justifications, the Civil Authority Orders were issued under the authority of state law permitting the governor to "promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property[.]"[121] These orders also required measures to protect against aerosol and

---

[121] *See, e.g.*, Mich. Exec. Order No. 2020-05, *Temporary prohibition on large assemblages and events, temporary school closures -RESCINDED*, OFF. GOVERNOR (Mar. 10, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521595--,00.html (last visited May 17, 2022).

fomite transmission and explicitly addressed Coronavirus' impacts on property.

125. On March 10, 2020, Governor Whitmer declared a state of emergency in response to the state's first two confirmed COVID-19 cases, both of which were in the Detroit area.[122]

126. Three days later, on March 13, 2020, Governor Whitmer issued an executive order banning all events or gatherings of more than 250 people in the state, severely limiting the operations of large entertainment venues such as MotorCity.[123] The order was issued, among other reasons, because of physical loss of or damage to property caused by Coronavirus and COVID-19.

127. In response to the order, Detroit Entertainment altered its property by, among other things, constructing temporary walls and taking other remedial measures to reduce virus transmission, including aerosol and fomite transmission, and making the property as safe as reasonably possible for its normal and intended use.[124]

---

[122] *Michigan announces first presumptive positive cases of COVID-19*, MICHIGAN.GOV (Mar. 10, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521365--,00.html (last visited May 17, 2022).

[123] *Governor Whitmer Orders Temporary Prohibition on Large Assemblages and Events*, OFF. GOVERNOR (Mar. 13, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521596--,00.html (last visited May 17, 2022).

[124] *COVID-19 Safety Plan*, MOTORCITY CASINO HOTEL (updated Feb. 18, 2022), https://www.motorcitycasino.com/ViewerRaw.aspx?Doc=HealthAndSafety&Pag

128. On March 16, 2020, Governor Whitmer issued an executive order restricting the use of "places of public accommodation" in order to, among other things, "protect life and property" from Coronavirus and COVID-19.[125] This included closing "to ingress, egress, use, and occupancy by members of the public" all restaurants, food courts, bars, taverns, club, theaters, indoor and outdoor performance venues, spas, and casinos licensed by the MGCB.[126] The MGCB issued an order the same day suspending all gaming operations at the Detroit casinos, including MotorCity.

129. On March 23, 2020, Governor Whitmer issued a statewide "Stay Home, Stay Safe" order, designed to, among other things, "protect life and property" from Coronavirus and COVID-19.[127] Among other things, the order prohibited all businesses and operations from requiring workers to leave their homes except under special circumstances, and banned public and private gatherings of any number of

---

e=COVID-19-Announcements&Banner=HealthSafety-COVID-19-Announcements-Banner (last visited May 17, 2022).

[125] Mich. Exec. Order No. 2020-09, *Temporary Restrictions on the Use of Places of Public Accommodation*, OFF. GOVERNOR (Mar. 16, 2020), https://www.michigan.gov/whitmer/news/state-orders-and-directives/2020/03/16/executive-order-2020-9 (last visited May 17, 2022).

[126] *Id*.

[127] Mich. Exec. Order No. 2020-21, *Temporary requirement to suspend activities that are not necessary to sustain or protect life – RESCINDED*, OFF. GOVERNOR (Mar. 23, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html (last visited May 17, 2022).

people outside a single household. Consistent with these and other orders issued throughout Spring 2020, and as a result of the presence of Coronavirus at MotorCity, MotorCity's casino closed and remained closed to the general public until August 5, 2020.

130. On July 29, 2020, Governor Whitmer issued two "Safe Start" executive orders[128] permitting the limited reopening of Detroit casinos, among other businesses, effective August 5, 2020, "subject to a 15% capacity limit and strict workplace safeguards."[129] These orders stated that limitations were necessary, among other reasons, "to protect life and property[.]"[130] These orders were expressly issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus, and explicitly in response to Coronavirus' impacts on property, they required, among other things, that businesses:

a. "[I]ncrease facility cleaning and disinfection to limit exposure to COVID-19, especially on high-touch surfaces (e.g., door handles), paying special attention to parts, products, and shared equipment (e.g.,

[128] *Governor Whitmer Amends MI Safe Start Order to Limit Indoor Gatherings, Save Lives*, OFF. GOVERNOR (July 29, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-535163--,00.html (last visited May 17, 2022).

[129] Mich. Exec. Order No. 2020-160, *Amended Safe Start Order – RESCINDED*, OFF. GOVERNOR (July 30, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-535195--,00.html (last visited May 17, 2022).

[130] *Id.*

tools, machinery, vehicles)";

b. "Require the use of work gloves where appropriate to prevent skin contact with contaminated surfaces";

c. "Train employees on . . . [d]istance that the virus can travel in the air, as well as the time it remains viable in the air and on environmental surfaces";

d. "Establish an enhanced cleaning and sanitizing protocol for high-touch areas like restrooms, credit-card machines, keypads, counters, shopping carts, and other surfaces";

e. "Disinfect high-touch surfaces in offices";

f. "Limit shared items for customers (e.g., condiments, menus) and clean high-contact areas after each customer (e.g., tables, chairs, menus, payment tools)";

g. "Ensure that ventilation systems operate properly";

h. And, specifically with respect to casinos:

    i. "Provide frequent opportunities for employees to wash and/or sanitize their hands to <u>reduce the result of surface transmission</u>";

    ii. "[C]lean and disinfect <u>all high-touch objects that are accessible to the public</u> (e.g. ATMs, counters, door handles, elevator panels and buttons, restrooms, dining tables, employee break rooms,

carts, chairs, table rails, trash bins, light switches, phones, kiosks, time clocks, etc.)";

iii. "Provide disinfecting wipes (to the extent they are available) throughout the casino to enable patrons to disinfect frequently touched surfaces";

iv. "Regularly maintain their HVAC systems and maximize the delivery of fresh air into the facility;" and

v. "Frequently disinfect slot machines . . . ."[131]

131. On August 4, 2020, the MGCB issued an "Order Setting Minimum Guidelines for Commercial Casinos to Reopen,"—specifically directed to Detroit Entertainment and the other two Detroit Casinos—providing guidelines for safe reopening consistent with guidance from the CDC and the State of Michigan. This order was expressly issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus, and explicitly in response to Coronavirus' impacts on property in numerous ways; it required the Detroit casinos to institute many new protocols, including the following:

a. Ensure that employees with heightened public contact be provided with

[131] Mich. Exec. Order No. 2020-161, *Safeguards to Protect Michigan's workers from COVID-19 – RESCINDED*, OFF. GOVERNOR (July 30, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-535196--,00.html (last visited May 17, 2022) (emphasis added).

"frequent opportunities to wash and/or sanitize their hands to reduce the risk of surface transmission";

b. "[C]lean and disinfect all its hard and soft surfaces in accordance with the CDC guidelines";

c. "[C]lean and disinfect all high-touch objects that are accessible to the public, (ex. ATMs, counters, door handles, elevator panels and buttons, restrooms, dining tables, employee break rooms, sensitive keys, carts, chairs, table rails, trash bins, light switches, phones, kiosks, time clocks, etc.)";

d. "[P]rovide disinfecting wipes (to the extent they are available) throughout the casino to enable patrons to disinfect frequently touched surfaces";

e. Put in place procedures "for cleaning shared equipment and uniforms";

f. "[R]egularly maintain their HVAC systems and maximize fresh air delivery into the facility";

g. Put in place "[e]nhanced cleaning protocols . . . throughout the facility, including back of house areas and Board casino offices";

h. "[F]requently disinfect slot machines, provide wipe dispensaries for slot machines, and post signs encouraging patrons to wipe down slot machines before and after use";

i. "[D]evelop a plan to address contamination on table surfaces, chips, cards, dice";

j. "Cards must be replaced before each shift for games where players touch cards";

k. "Licensee must develop protocols for chips to be cleaned and sanitized daily";

l. "Dice must be disinfected for each new shooter";

m. Ensure that frequently touched areas at a table are "sanitized often including, but not limited to pit stands, gaming devices and equipment, chairs, and table bumpers/arm rests";

n. Ensure that dealers, supervisors or other table game personnel "sanitize card shoes, dice and other gaming devices and equipment on a frequent basis";

o. Provide food and drinks in disposable dishware; and

p. Frequently clean and sanitize "sports wagering tables, seats, kiosks, ticket counters, ATM's and redemption terminals."[132]

---

[132] *In the Matter of Greektown Casino, L.L.C., Detroit Entertainment, L.L.C., & MGM Grand Detroit, L.L.C., Order Setting Minimum Guidelines For Commercial Casinos To Reopen*, MICH. GAMING CONTROL BD. (Aug. 4, 2020), http://web.archive.org/web/20200925101613/https://www.michigan.gov/documents/mgcb/Detroit_Casinos_Minimun_Reopening_Guidelines_2020-8-4_698360_7.pdf (last visited May 17, 2022).

132. On September 25, 2020, Governor Whitmer issued Executive Order 2020-184 "Safeguards to Protect Michigan's Workers from COVID-19," providing workplace standards to prevent viral transmission in the course of reopening Michigan businesses.[133] Like the July 29, 2020 "Safe Start" executive orders, this order was expressly issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus, and explicitly in response to Coronavirus' impact on property. It included similar and additional requirements for protecting property and people from aerosol and fomite infection and transmission.

133. On October 9, 2020, the Detroit Health Department issued an "Emergency Order for Control of Epidemic" to reduce transmission of COVID-19 after a resurgence of transmission rates. The order was issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus. Among other things, the order recognized that "Detroit residents are predominantly African American . . . and the Centers for Disease Control and Prevention has stated, '[l]ong-standing systemic health and social inequities have put many people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-

---

[133] Mich. Exec. Order No. 2020-161, *Safeguards to Protect Michigan's workers from COVID-19 – RESCINDED*, OFF. GOVERNOR (July 30, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-535196--,00.html (last visited May 17, 2022).

19.'"[134] This order was expressly issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus, and explicitly in response to Coronavirus' impacts on property. It included requirements for protecting property and people from aerosol and fomite infection and transmission similar to the orders discussed above.

134. On October 14, 2020, the Michigan Department of Labor and Economic Opportunity, through the Michigan Occupational Safety & Health Administration ("MIOSHA"), promulgated "Emergency Rules: Coronavirus Disease 2019 (COVID-19),"[135] to mitigate and limit COVID-19's spread in workplaces and to protect employees across Michigan. The MIOSHA Emergency Rules were expressly issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus, and explicitly in response to Coronavirus' impacts on property. These Emergency Rules included requirements for protecting property and people from aerosol and fomite infection and transmission similar to the orders discussed above.

---

[134] *Emergency Order for Control of Epidemic*, DETROIT HEALTH DEP'T (Oct. 9, 2020), https://detroitmi.gov/sites/detroitmi.localhost/files/2020-10/Executed%20Public%20Health%20Order%20DZF%2010-09-2020%20FINAL.PDF (last visited May 17, 2022).

[135] *Emergency Rules: Coronavirus Disease 2019 (COVID-19)*, MICH. DEP'T LAB. & ECON. OPPORTUNITY (Oct. 14, 2020), *available at*, https://content.govdelivery.com/attachments/MIEOG/2020/10/14/file_attachments/1570997/MIOSHA%20Emergency%20Rules%2010-14-20.pdf (last visited May 19, 2022).

135. On October 16, 2020, the MGCB issued an "Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos," containing similar and additional requirements to its August 4, 2020 order discussed above.[136]

136. On November 15, 2020, after it had issued other emergency orders regulating the size of public gatherings in October 2020, the MDHHS issued an emergency "epidemic order" limiting indoor social gatherings and other group activities in effort to protect against further COVID-19 outbreaks.[137] Under this order, among other things, indoor residential gatherings were limited to two households at a time; bars and restaurants could only remain open for outdoor dining, carry out and delivery; and Detroit casinos were ordered closed as of November 18, 2020.[138] The order was extended until December 20, 2020.

137. On December 18, 2020, MDHHS issued a "Gatherings and Face Mask Order," taking effect December 21, 2020, permitting, *inter alia*, gatherings at casinos

---

[136] *In the Matter of Greektown Casinos, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos*, MICH. GAMING CONTROL BD. (Oct. 16, 2020), https://web.archive.org/web/20201220004814/https://www.michigan.gov/documents/mgcb/Detroit_Casinos_Minimun_Reopening_Guidelines_2020-8-4_698360_7.pdf (last visited May 19, 2022).

[137] *MDHHS Issues Three-Week Epidemic Order to Save Lives, Protect Frontline Heroes During Fall COVID-19 Surge*, MICH. DEP'T HEALTH & HUM. SERVS. (Nov. 15, 2020), https://www.michigan.gov/mdhhs/0,5885,7-339--545138--,00.html (last visited May 17, 2022).

[138] *Id.*

subject to certain capacity and distancing requirements.[139] On December 23, 2020, the MGCB issued an "Order Setting Minimum Guidelines for Commercial Casinos to Reopen."[140] This order was expressly issued, among other reasons, to protect against aerosol and fomite transmission of Coronavirus, and explicitly in response to Coronavirus' impacts on property. It included requirements for protecting property and people from aerosol and fomite infection and transmission similar to the orders discussed above. The MGCB issued similar orders on January 31, 2021 and February 16, 2021.[141]

138. MotorCity reopened again on December 23, 2020, in a very limited capacity, under severe restrictions and with safety measures that forced Detroit Entertainment to incur extra expenses by, among other things, reconfiguring its

---

[139] *MDHHS Gatherings and Face Masks Order*, MICH. DEP'T HEALTH & HUM. SERVS. (Dec. 18, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-547899--,00.html (last visited May 17, 2022).

[140] *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Commercial Casinos to Reopen*, MICH. GAMING CONTROL BD. (Dec. 23, 2020), http://web.archive.org/web/20210304005353/https://www.michigan.gov/documents/mgcb/Order_implementing_11-15-20_MDHHS_Order_708052_7.pdf (last visited May 17, 2022).

[141] *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos*, MICH. GAMING CONTROL BD. (Jan. 31, 2021); *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos*, MICH. GAMING CONTROL BD. (Feb. 16, 2021).

gaming floors. These measures were undertaken to prevent further physical loss of or damage to Detroit Entertainment's property from Coronavirus and to protect the health, safety and welfare of MotorCity's employees and customers.

139. Among other things, even after reopening, MotorCity's capacity for guests was severely limited; its dining establishments were either closed completely or open for take-out only; all bars were closed; D.Tour Spa was closed; no meetings or banquets were held; no concerts or shows were held; and coat check and valet service remained closed in the middle of the Michigan winter. Additionally, Detroit Entertainment had to protect its property from physical loss or damage, as well as protect the safety of occupants, by sectioning off the gaming floor to limit occupancy in each section.

140. Additional Civil Authority Orders continued to restrict Detroit Entertainment's operations due to the physical loss of or damage to property caused by Coronavirus. For example:

- MGCB's January 31, 2021 and February 16, 2021 orders, for example, regulated capacity and food and beverage consumption, prohibited concerts, live events, and shows, and addressed, among other things, contamination on table surfaces, chips, cards, and dice.[142]

---

[142] *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos*, MICH. GAMING CONTROL BD. (Jan. 31, 2021); *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued*

- As of February 2021, Michigan had continued to place significant limitations on indoor dining, including limiting restaurant and bar capacity to 25% and no more than 100 people, with tables limited to 6 people or less, and with a 10:00 pm curfew.[143]

- On March 5, 2021, Michigan relaxed these restrictions slightly, but continued to place substantial limitations on indoor dining, including limiting restaurant and bar capacity to 50% and no more than 100 people, limiting tables to 6 people or less, and instituting an 11:00 p.m. curfew.[144]

- On March 4, 2021, the MGCB issued another order relating to masking, social distancing requirements, screening prospective entrants to the casino for signs of COVID-19, ventilation requirements, capacity restrictions on distinct spaces, the number of individuals in a group, employee training, use and deployment of PPE, and sanitizing products and cleaning requirements.[145] The order also prohibited certain activities such as concerts, nightclubs, shows, live events, valet

*Operation of Commercial Casinos*, MICH. GAMING CONTROL BD. (Feb. 16, 2021).

[143] *Feb. 1: Indoor Dining Guidelines*, MICH. DEP'T HEALTH & HUM. SERVS. (Feb. 1, 2021), http://web.archive.org/web/20210201081109/https://www.michigan.gov/documents/coronavirus/Indoor_Dining_Guidelines_v7_713766_7.pdf (last visited May 17, 2022).

[144] *March 5: Indoor Dining Guidelines*, MICH. DEP'T HEALTH & HUM. SERVS. (Mar. 5, 2021), https://www.michigan.gov/documents/coronavirus/Indoor_Dining_Guidelines_v7_713766_7.pdf (last visited May 17, 2022).

[145] *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos*, MICH. GAMING CONTROL BD. (Mar. 4, 2021).

services, coat check and others.[146]

- On May 15, 2021, the MGCB, in a response to a similar order issued by the MDHHS, issued another order, which continued to place restrictions on Detroit Entertainment's operations but did allow patrons fully vaccinated against COVID-19 to enter the casino without a face mask. The order still maintained social distancing requirements and virtually all of the other requirements set forth in the MGCB's March 4, 2021 order.[147]

141. The cause of these and other Civil Authority Orders was Coronavirus and COVID-19.

**J. Detroit Entertainment Deployed Extensive Safety, Cleaning and Disinfection Measures in An Attempt to Eliminate the Presence of the Virus and Continue Operating and Prevent Further Direct Physical Loss of or Damage to its Property but These Measures Themselves Physically and Materially Altered and Physically Damaged Detroit Entertainment's Property and Also Failed to Completely Prevent the Presence of Coronavirus at the MotorCity Complex**

142. Detroit Entertainment undertook herculean efforts and incurred massive expenses, covered as EXTRA EXPENSE and as PROTECTION AND PRESERVATION OF PROPERTY under the Policy, to help minimize Coronavirus exposure risks and make MotorCity as safe as reasonably possible, to protect its

[146] *Id.*

[147] *In the Matter of Greektown Casino, LLC, Detroit Entertainment, LLC and MGM Grand Detroit, LLC, Order Setting Minimum Guidelines for Continued Operation of Commercial Casinos,* MICH. GAMING CONTROL BD. (May 15, 2021), https://www.michigan.gov/documents/mgcb/Order_implementing_11-15-20_MDHHS_Order_708052_7.pdf (last visited May 19, 2022).

employees and customers, to resume and continue operating as close to normal as possible (meaning, the way MotorCity ran and performed prior to the emergence of Coronavirus and COVID-19), to temporarily protect or preserve Covered Property due to actual or imminent physical loss or damage to Detroit Entertainment's property and/or in order to prevent or mitigate the further direct physical loss of or damage to the MotorCity complex caused by the physical presence of Coronavirus at the complex and to ameliorate, as much as possible, the direct physical loss of or damage to Detroit Entertainment's property caused by Coronavirus and COVID-19.

143. These protective actions performed by Detroit Entertainment included:

- deep cleaning of and extensive modifications to its premises by physically and materially altering it;
- purchasing and deploying large quantities of sanitizing products, including aerosol foggers and liquid disinfectants;
- drilling plexiglass covers into gaming tables, creating holes in them and physically and materially altering and physically damaging them such that when the plexiglass was subsequently removed, the gaming layouts on nearly all of the casino's 54 gaming tables had to be completely replaced;
- the purchasing and deployment of massive amounts of PPE;
- requiring all employees and customers to wear masks and providing

masks to all employees and customers who needed them;

- requiring employees to wear gloves in certain situations where the risk of fomite transmission would otherwise be enhanced;
- installing COVID-19 screening stations;
- implementing strict COVID-19 health screening procedures including temperature checks for all employees, vendors, and customers, with screening questions and enhanced protocols designed to respond to situations potentially involving COVID-19 exposure, and the barring of entry to anyone MotorCity concluded was showing signs of illness;
- placing numerous hand sanitizing stations around the complex for MotorCity's employees and customers;
- erecting barriers to maintain proper social distancing;
- installing plexiglass shields;
- installing nanoseptic film on high-touch surfaces to hinder fomite transmission;
- reconfiguring indoor spaces;
- drastically reducing capacity/occupancy limits;
- purchasing and deploying social distancing signage and markers;
- purchasing and deploying traffic flow signage and markers;

- limiting face-to-face interactions between employees and customers and between customers and other customers;
- purchasing cleaning and disinfecting products that meet or exceed Centers for Disease Control and Prevention ("CDC") and Michigan state guidelines;
- implementing dramatically enhanced and increased cleaning and disinfecting procedures and protocols, including on surfaces and materials; and
- providing not just masks, but other PPE to employees.

144. Beginning on August 5, 2020, Detroit Entertainment reopened its casino. The reopening, however, did not abate Detroit Entertainment's losses arising from the direct physical loss of or damage to its property. In fact:

- some of the aerosol and liquid disinfectants Detroit Entertainment used caused physical and material alteration of and physical damage to property essential to the functioning of the casino, including its electronic gaming machines, requiring their repair or the replacement of certain of their components – which is physical loss or damage to Detroit Entertainment's property that caused it to sustain Time Element and property losses, among other covered losses; and
- despite its extensive remedial measures over 620 Detroit Entertainment

employees were diagnosed as COVID-19 positive, resulting in them being required to isolate and numerous other employees with whom they had been in close contact being required to quarantine, thus further disrupting/slowing down Detroit Entertainment's operations. This fits squarely within the Policy's requirement that covered Time Element losses be caused by a "suspension" of operations.

145. To attempt to eliminate the presence of Coronavirus from the air and the surfaces at the MotorCity complex, Detroit Entertainment sprayed its entire casino, the food court, restaurants and its restrooms initially regularly and then nightly with foggers using aerosolized disinfectants. Similarly, Detroit Entertainment sprayed MotorCity's convention center and its separate meeting rooms, such as the Conveyor Room, Directors Room, and Hotel Lobby conference room with those aerosolized disinfectants every night after they were used. The aerosolized disinfectants, however, infiltrated into and physically and materially altered and physically damaged the electronics inside the casino's electronic gaming machines. Upon information and belief, these aerosolized disinfectants have caused damage to property within the MotorCity complex that is not visibly obvious yet and has reduced the functional life of property within the MotorCity complex, including electronics, rugs, linens, rubber, vinyl and other property.

146. In a further attempt to eliminate the presence of Coronavirus from its

electronic gaming machines, Detroit Entertainment wiped them down using liquid disinfectants. These liquid disinfectants, however, damaged the buttons and screens of numerous electronic gaming machines inside the casino, such that they needed to be repaired or replaced and, in some cases, taken out of service to do so, resulting in Time Element and property loss. Photographs of representative examples of the damage caused to the electronic gaming machine buttons at the casino are set forth below:


ONLY HIGHEST WINNER PAID ON EACH PLAYED LINE
1 CREDIT= $0.25
PLAY 1 LINE
PLAY 1 PER LINE
PLAY 7 LINES
PLAY 9 LINES
PLAY 5 PER LINE
INSERT BILLS
THIS MACHINE ACCEPTS TICKETS
TICKET


TAKE WIN
PLAY 1 LINE
HEARTS
PLAY 5 LINES
PLAY 10 LINES
START
BET 1
BET 2
BET 3
BET 5




147. As a result of this physical and material alteration and physical damage to its electronic gaming machines caused by aerosolized and liquid disinfectants, Detroit Entertainment had to remove some of its electronic gaming machines from service for repairs, resulting in a loss of revenue, causing it to sustain both Time Element loss for the time when the property was damaged or lost and property loss.

148. Upon information and belief, these liquid disinfectants have caused

damage to property within the MotorCity complex that is not visibly obvious yet and has reduced the functional life of property within the MotorCity complex, including electronics, rugs, linens, rubber, vinyl and other property.

149. In connection with each re-opening of MotorCity's casino and other amenities, and continuing thereafter, including to this very day, Detroit Entertainment has taken all of these steps with the goal of ensuring that MotorCity remains safe, providing hope, employment and entertainment for Detroiters and Michiganders – the lifeblood of its business.

150. Despite concerted safety processes, Detroit Entertainment personnel have not escaped the risks of exposure to and infection from Coronavirus. Since March 2020, over 620 MotorCity employees have reported to Detroit Entertainment that they contracted COVID-19. The illnesses of so many of its employees (and corresponding need for them to isolate and other employees with whom they had been in close contact to quarantine) have further slowed down (suspended) Detroit Entertainment's operations, causing it to sustain additional losses that are covered under the Policy.

151. The length of the Period of Liability experienced by Detroit Entertainment as a result of the slowdown ("Suspension" as defined in the Policy) to its business operations by the presence of Coronavirus and as a result of its attempts to repair, restore or replace its property damaged by Coronavirus and/or by

the cleaners and disinfectants Detroit Entertainment used to combat Coronavirus was significant.

152. Detroit Entertainment suffered other covered losses during the relevant time period as well. For example, during the period of time between November 17, 2020 and December 23, 2020 when the MotorCity casino was closed, one of the freezers at MotorCity suffered a breakdown, resulting in the loss of its cooling capacity. Detroit Entertainment discovered the loss when it reopened and it found that the food inside the freezer had spoiled. As a result, Detroit Entertainment was forced to dispose of spoiled food valued at $64,502.27 as of December 26, 2020. This loss is covered under the Policy's coverage for Spoilage and Detroit Entertainment included this in its claim to AGLIC. AGLIC, however, never investigated the claim and the extensive loss and thus never paid it.

## K. The Devastating Toll to Detroit Entertainment from Coronavirus and COVID-19

153. Detroit Entertainment experienced direct physical loss of or damage to its property, and so did the Attraction Properties, in at least four ways:

(1) the presence of Coronavirus in the indoor air and on surfaces at the MotorCity complex (as proven by both the over 620 Detroit Entertainment employees who tested positive for COVID-19 and the biostatistical evidence discussed above) physically and materially altered and transformed the

content of the air and the surfaces at the MotorCity complex, caused actual physical damage to those properties, and also caused the loss, in whole or in part, of the functional use of those properties;

(2) the physical and material alteration of and the physical damage to property within the MotorCity complex from: (a) the chemicals used by Detroit Entertainment in its attempt to clean and disinfect Coronavirus; and (b) the physical modifications Detroit Entertainment made to its property to continue operating, such as drilling holes in nearly all 54 of its gaming tables in order to install plexiglass, to make its facilities safer and more fit for their normal and intended use, requiring, in many instances, the removal and replacement of property within those facilities due to such damage, causing Detroit Entertainment to sustain Time Element loss for which it seeks specific Time Element loss damages for the time when that property was damaged or lost;

(3) through the need to modify physical behaviors to facilitate social distancing, avoid confined indoor spaces, and avoid having employees or guests congregating in the same physical area as others, all in order to reduce or minimize the potential for viral transmission, resulting in additional Time Element loss; and

(4) through the need to mitigate the threat or actual physical presence

of Coronavirus on frequently-touched surfaces and objects, including door handles, bathrooms faucets, miscellaneous surfaces, as well as in heating and air conditioning systems and in or on any other of the multitude of places that Coronavirus has been or could be found.

154. Coronavirus' and COVID-19's impact to Detroit Entertainment's business cannot be overstated.

155. As of April 1, 2020, nearly all of Detroit Entertainment's then 2,600-plus employees had been placed on furlough and many were ultimately laid off. As of January 2021, over 1,100 employees remained out of work. These furloughs/layoffs resulting from Coronavirus and/or COVID-19 have significantly impacted the lives of Detroit Entertainment's employees who depend on MotorCity to support themselves and their families.

156. Detroit Entertainment derives most of its revenue from its casino. If the casino cannot operate at full capacity, Detroit Entertainment's revenues sharply decline from pre-COVID-19 levels.

157. The casino at MotorCity was closed from March 16, 2020 through August 4, 2020, and again from the end of the day on November 17, 2020 through December 22, 2020. To the extent the casino was re-opened, each time this was at reduced capacity (the first time, at 15% of fire code capacity, and the second time effectively at 12.4% of fire code capacity) and without the ability to offer many

associated services and activities at MotorCity.

158. Moreover, the continuous and repeated presence of Coronavirus and COVID-19 at MotorCity has caused physical loss of or damage to that property, resulting in a slowdown or cessation (defined in the Policy as a "Suspension") of Detroit Entertainment's business operations. The slowdown, that is "Suspension," of Detroit Entertainment's business operations caused by the physical presence of Coronavirus and COVID-19 at the MotorCity complex, continued long after the casino reopened. Thus, the physical loss of or damage to Detroit Entertainment's properties has resulted in a dramatic decrease in its revenues.

159. Moreover, the physical damage to and physical and material alteration of property at MotorCity essential to operation of the casino and other amenities, such as its electronic gaming machines, caused by the chemicals used in Detroit Entertainment's attempts to clean and disinfect the virus, caused yet more slowdowns to Detroit Entertainment's business operations, resulting in additional Time Element and property losses.

160. Detroit Entertainment's losses to date exceed $270 million.

161. Thus, the damage to Detroit Entertainment and others will only continue, although the development of vaccines and treatments for Coronavirus and COVID-19 have significantly mitigated Detroit Entertainment's losses. The dire situation of Coronavirus and COVID-19 that Detroit Entertainment and the world

faced in 2020 cannot be viewed through the prism of the medical miracles available in 2022. The facts of this claim must be considered as the world existed at the time Detroit Entertainment suffered its losses under the Policy – a world with no vaccines, no FDA-approved treatments of COVID-19, refrigerated morgue trucks parked outside hospitals and the repeated reintroduction of Coronavirus into businesses.

162. Detroit Entertainment has suffered and continues to suffer catastrophic losses from the closures of the MotorCity complex and other restrictions and limitations on its business operations in connection with the above-cited Civil Authority Orders as well as from the presence of Coronavirus at MotorCity. The closures, significant restrictions, and limitations have deprived Detroit Entertainment of the full functional use of its property, causing further direct physical loss of or damage to Detroit Entertainment's property. The lost gaming revenue alone exceeds $270 million and there are substantial additional losses.

163. Detroit Entertainment timely notified AGLIC of these losses and has met all conditions and requirements for coverage under the Policy. As set forth herein, AGLIC has wrongly refused to provide full coverage and, instead, has paid only $100,000—less than one tenth of one percent of Detroit Entertainment's losses.

## L. The "All-Risk" Commercial Property Policy and Potentially Applicable Coverages

164. In exchange for a very substantial premium, AGLIC sold Detroit

Entertainment the Policy, policy number ERP3061326-01, effective December 1, 2019 to December 1, 2020. The Policy provides coverage for property losses, for business interruption losses ("Time Element" per the policy language), and other losses. The policy limit for the Policy is $750,000,000 (the "Policy Limit").

165. Detroit Entertainment fully paid the premium for the Policy.

166. AGLIC and/or its parent company, Zurich, drafted the Policy, which includes the Zurich EDGE™ coverage form. Detroit Entertainment played no role in drafting or negotiating the Policy or the included Zurich EDGE™ coverage form.

167. When introduced in 2008, the Zurich EDGE™ coverage form was marketed as offering uniquely "broader coverage and greater flexibility" that would "enhance . . . our ability to serve customers in this important line of business and offers significant advantages for global property programs . . . ."[148] Zurich's CEO made this announcement in a press release, dated April 22, 2008, and lauded the clarity of the form, boasting that "The Zurich Edge policy is clearly written with all limits, sub-limits and other critical coverage issues incorporated within the policy declarations."[149]

168. Zurich also touted the EDGE™ coverage form to insurance regulators.

---

[148] *Zurich introduces The Zurich Edge™ for Highly Protected Risks and Global Property Markets*, Media Release, BLOOMBERG L. (Apr. 22, 2008), (last visited May 17, 2022).

[149] *Id.*

For example, in an Explanatory Memorandum Zurich filed with the California Department of Insurance and the Oregon Insurance Division on January 11, 2008 and February 5, 2008, respectively, Zurich claimed that the EDGE™ coverage form offers "our Insured's [sic] a very broad and flexible policy."

169. The Policy sold to Detroit Entertainment insures against "[a]ll risks of direct physical loss of or damage from any cause unless excluded," and provides coverage for property damage losses, business interruption losses ("Time Element" per the policy language), and other losses.

170. The phrase "physical loss of or damage" is not defined or limited in the Policy. In plain English, "physical loss of or damage" to property denotes at least the following meanings: (1) actual physical damage to that property; (2) the physical and material alteration of that property; (3) the interaction of an external physical substance or force with that property, including its presence in the air or on the surfaces of that property, rendering the property unfit, unsafe or uninhabitable for normal use, causing that property to lose, in whole or in part, its functional use or otherwise negatively affecting the property's usability; or (4) the loss of use or the loss of functional use, whether in whole or in part, of that property.

171. Moreover, because the Policy covers "all risks of" direct physical loss of or damage from any cause unless excluded, actual physical loss of or damage to property is not required to trigger the Policy's coverage. The risk of such physical

loss of or damage to covered property triggers the Policy's coverage.

172. In 2013, the Insurance Services Office ("ISO") recommended that its members (including Zurich) delete the "risks of" language from their all-risk commercial property policies because of a concern that it provided broader coverage than the insurer may wish to provide. Zurich followed that guidance in other property policy forms. *See* Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleading at Ex. D, *QDOBA Restaurant Corp. v. Zurich Am. Ins. Co.*, No. 1:20-cv-03575-DDD-SKC (D. Colo. Feb. 28, 2022), ECF No. 69-4; (Defendant Zurich American Insurance Company's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint at Ex. 2, *Down Ford, Inc. v. Zurich*, No. 3:20-cv-08595-BRM-ZNQ (D.N.J. July 17, 2020), ECF No. 4-3, Ex. 69. Zurich, however, chose to retain the coverage-broadening "risk of" language in its top-end Zurich EDGE™ form, which compromises the Policy.

173. The Policy Limit is $750,000,000 "for the total of all coverages." The full Policy Limit applies to losses claimed under the Policy's Property Damage and Time Element coverages.

174. The Policy does not exclude virus, pandemics, communicable disease, COVID-19, or Coronavirus as causes of loss. Thus, the Policy's entire $750,000,000

Policy Limit is available for Detroit Entertainment's losses.[150]

175. The Policy's full terms and conditions are set forth therein, but as relevant here, the Policy provides as follows:

**1. Time Element and Time Element Coverages**

176. The Policy covers Time Element loss resulting from "the necessary **Suspension**[151] of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**[.]"

177. The Policy defines **Suspension** as the "slowdown or cessation of the Insured's business activities[.]"

178. The Policy further defines Suspension "as respects rental income that a part or all of the Insured Location is rendered untenantable."

179. Accordingly, the Policy's definition of Suspension: (a) provides Time Element (business interruption) coverage to Detroit Entertainment for operating its business while impaired as a result of physical loss of or damage to covered property not otherwise excluded such as a partial loss of functional use of an Insured

[150] AGLIC asserts, and Detroit Entertainment disagrees, that virus-related losses are excluded under the Policy.

[151] Unless otherwise noted, capitalized and bolded terms herein are capitalized and bolded in the Policy.

Location; and (b) does not condition Time Element (business interruption) coverage on a total shutdown of Detroit Entertainment's business operations such as the total uninhabitability, complete or even partial untenantability or a total loss of functional use of an Insured Location.

180. MotorCity is an Insured Location under the Policy.

181. The Policy defines Covered Cause **of Loss** as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."

182. As set forth above, Coronavirus and COVID-19 caused direct physical loss of or damage to property at MotorCity by, among other things, physically and materially altering that property. Coronavirus and COVID-19 also rendered such property unfit and unsafe for its normal use or caused the loss, in whole or in part, of functional use of Detroit Entertainment's property, depriving Detroit Entertainment of its property. Moreover, the cleaners, disinfectants and other measures used by Detroit Entertainment to attempt to eliminate the presence of Coronavirus from the MotorCity complex physically and materially altered and physically damaged Detroit Entertainment's property, requiring the repair or replacement of that property and causing disruptions, slowdowns, and lost revenue to Detroit Entertainment's business operations.

183. Detroit Entertainment seeks specific damages for repairing or replacing such physically and materially altered property including Time Element damages for

the period of time that such property was damaged or lost. AGLIC, however, never investigated or measured this loss – including Detroit Entertainment's substantial Time Element loss from the slowdown of its business operations caused by the presence of Coronavirus at the MotorCity complex and the necessary slowdown/repairs/Suspensions of its operations to repair and replace its damaged property from its extraordinary mitigation efforts to combat Coronavirus – but rather denied coverage after refusing to pay anything other than $100,000 for Communicable Disease loss.

184. Neither Coronavirus nor COVID-19 is excluded under the Policy.

185. Among the Policy's Time Element Coverages is GROSS EARNINGS, covering "the actual loss sustained by the Insured during the Period of Liability." GROSS EARNINGS is subject to a Limit of Liability of $195,400,000.

186. Detroit Entertainment derives most of its revenue from its casino. The casino at MotorCity was closed from March 16, 2020 through August 4, 2020, and again from the end of the day on November 17, 2020 through December 22, 2020. To the extent the casino was re-opened, each time this was at reduced capacity (the first time, at 15% of fire code capacity, and the second time effectively at 12.4% of fire code capacity) and without the ability to offer many associated services and activities at MotorCity. Moreover, the physical presence of Coronavirus and the physical damage from the cleaners and disinfectants used to combat the presence of

Coronavirus at the MotorCity complex caused a slowdown, that is, a "Suspension", of Detroit Entertainment's business operations. As such, Detroit Entertainment has sustained and is sustaining a substantial Time Element loss of its Gross Earnings, as insured under the Policy.

187. The Policy includes an EXTENDED PERIOD OF LIABILITY, providing in relevant part: "Upon the termination of the coverage for Gross Earnings loss under 4.02.01.01. this Policy will continue to pay the actual Gross Earnings loss sustained by the Insured" for up to 365 days.

188. The Policy provides EXTRA EXPENSE coverage, covering "the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**."

189. As set forth herein, Detroit Entertainment incurred Extra Expenses to clean, disinfect, and restore its property so that it could resume and continue as nearly as practicable its normal business activities that would otherwise be suspended due to direct physical loss of or damage caused by Coronavirus and COVID-19, costs associated with altering its property to protect it from physical loss of or damage, as well as protecting the safety of its employees and customers, such

as erecting barriers, installing COVID-19 screening stations, installing plexiglass shields, installing nanoseptic film, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees and customers.

**2. Special Coverages**

190. The Policy includes numerous Special Coverages that apply to Detroit Entertainment's losses from Coronavirus and COVID-19. These include the following, among others:

191. The Policy provides, by endorsement, INTERRUPTION BY COMMUNICABLE DISEASE coverage ("the ICD Coverage") for "the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the **Location**" and the "reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substances(s) causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such

authorized governmental agency."[152]

192. The Policy provides CIVIL OR MILITARY AUTHORITY coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations."

193. Coronavirus and COVID-19 caused direct physical loss of or damage to property throughout the city of Detroit and State of Michigan, and caused the deprivation of use of such property, including property within three (3) miles of the MotorCity complex, giving rise to the actions of civil authority, including by the Governor of the State of Michigan, the MDHHS and the MGCB as set forth herein, including the issuance of the Civil Authority Orders. These orders were issued as a result of governmental responses to the presence of Coronavirus, a deadly hazardous substance, in the indoor air and on surfaces of properties open to the public within

[152] The Interruption by Communicable Disease Endorsement is attached hereto as Ex. 70.

three (3) miles of the MotorCity complex, which caused direct physical loss of or damage to such properties by rendering them uninhabitable, untenantable, unsafe, unfit for their normal and intended use or otherwise causing them to lose, in whole or in part, their functional use. These orders prohibited access to the MotorCity complex.

194. The Policy provides PROTECTION AND PRESERVATION OF PROPERTY coverage, for "[t]he reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property" and "[t]he Gross Earnings loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property."

195. Detroit Entertainment undertook costly measures necessary to protect MotorCity from further loss or damage and to protect, as much as possible, the health, safety and welfare of its employees and customers. These measures included, among other things, altering its property to protect it from physical loss of or damage, and taking measures to protect the safety of its employees and customers, such as erecting barriers, installing COVID-19 screening stations, installing plexiglass shields, installing nanoseptic film, reconfiguring indoor spaces,

disinfecting surfaces and materials, and providing PPE to employees and customers. Additionally, during times of low or no occupancy at MotorCity's casino and other facilities, to mitigate its losses and protect its property, Detroit Entertainment incurred costs associated with security and surveillance, fire monitoring, elevator and escalator maintenance, HVAC maintenance, pest control, utilities, and general maintenance.

196. The Policy provides SPOILAGE coverage for "spoilage of **Raw Materials**, **Stock in Process**, **Finished Stock** or **Merchandise**, caused by a sudden and accidental **Breakdown** of **Covered Equipment** or a part thereof . . . provided the **Raw Materials**, **Stock in Process**, **Finished Stock** or **Merchandise** is in storage or in the course of being manufactured."

197. During the period of time between November 17, 2020 and December 23, 2020, one of the freezers at MotorCity suffered a breakdown, resulting in the spoilage, disposal and complete loss of the food stored within that freezer. The spoiled food was valued at $64,502.27 as of December 26, 2020. This loss is covered under the Policy's coverage for Spoilage.

198. No exclusions apply to Detroit Entertainment's claim arising from its losses from Coronavirus and COVID-19 (the "Detroit Entertainment Claim").

### 3. The Policy's Contamination Exclusion Does Not Bar Coverage

199. The Policy contains an exclusion at Section 3.03.01.01 (the

"Contamination Exclusion"), which excludes "**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy."

200. The Policy's Contamination Exclusion does not bar the Detroit Entertainment Claim.

201. The Policy's Contamination Exclusion applies expressly to "costs" and makes no mention of and therefore does not exclude any "loss" – including business interruption loss.

202. This is significant because, as demonstrated in the chart below, the Policy treats "costs" and "loss" as two completely separate and distinct concepts in both its coverages and in its exclusions:

**Coverages (Loss vs. Costs)**

| | Type of Coverage | Description |
|---|---|---|
| **COSTS** | **Decontamination Costs** | If Covered Property is **Contaminated** from direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and there is in force at the time of the loss any law or ordinance regulating **Contamination** due to the actual not suspected presence of **Contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased **cost** of decontamination and/or removal of such **Contaminated** Covered Property in a manner to satisfy such law or ordinance . . . . |

| | | |
|---|---|---|
| | **Protection and Preservation of Property** | The reasonable and necessary **costs** incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property |
| | **Expediting Costs** | This Policy covers the reasonable and necessary **costs** incurred to pay for the temporary repair of direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and to expedite the permanent repair or replacement of such damaged property. |
| | **Professional Fees** | This Policy covers the actual **costs** incurred by the Insured, of reasonable fees paid to the Insured's accountants, architects, auditors, engineers, or other professionals. . . . |
| LOSS | **Gross Earnings Loss** | The actual **loss** sustained by the Insured during the Period of Liability |
| | **Civil or Military Authority** | The Company will pay for the actual Time Element **loss** sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. . . . |
| | **Ingress/Egress** | The Company will pay for the actual Time Element **loss** sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this |

| | | |
|---|---|---|
| | | Policy and located within the distance of the Insured Location as stated in the Declarations. . . . |
| | **Contingent Time Element** | This Policy covers the actual Time Element **loss** as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations**, and **Attraction Properties**. . . . |
| | **Protection and Preservation of Property** | The Gross Earnings **loss** sustained by the Insured . . . prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property |
| | **Tenants Prohibited Access** | The Company will pay for the actual Gross Earnings **loss** sustained, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if access to that **Location** by the Insured's suppliers, customers or employees is physically obstructed due to the owner, landlord or a legal representative of the building owner or landlord, prohibiting access to the Insured Location. . . . |

**Exclusions (Loss vs. Costs)**

| **Provision** | **Lead-In Language** | **Exclusion** |
|---|---|---|
| 3.03.01.01. | The following exclusions apply unless specifically | **Contamination**, and any **cost** due to **Contamination** including the inability to use or occupy property or any **cost** |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| | stated elsewhere in this Policy: This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy. | of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy. |
| 3.03.01.03. | The following exclusions apply unless specifically stated elsewhere in this Policy: This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy. | **Loss** or damage arising from the enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, improvement, modification, demolition, occupancy, operation or other use, or removal including debris removal of any property. |
| 3.03.02.01. | This Policy excludes: | **Loss** or damage arising from delay, loss of market, or loss of use. |
| 3.03.02.02. | This Policy excludes: | Indirect or remote **loss** or damage. |
| 3.03.02.03. | This Policy excludes: | **Loss** or damage arising from the interference by strikers or other persons with rebuilding, repairing or replacing property or with the resumption or continuation of the Insured's business. |
| 3.03.02.05. | This Policy excludes: | **Loss** or damage resulting from the Insured's suspension of business |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| | | activities, except to the extent provided by this Policy. |
| 3.03.03.01. | This Policy excludes direct physical **loss** or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss: | Nuclear reaction or radiation, any by-product of nuclear reaction, any radiological material or radioactive contamination however caused; but if direct physical loss of or damage to Covered Property by fire or sprinkler leakage results, the Company will pay for the loss or damage caused by the fire or sprinkler leakage. |
| 4.02.05.01.01. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any **loss** during any idle period that would have been experienced had the **Suspension** of business activities not occurred. This includes, but is not limited to, when production, operation, services, delivery or receipt of goods or services or any other business activities would have ceased, or would not have taken place or would have been prevented due to: planned or rescheduled shutdown; strikes or other work stoppage; or any reason other than physical loss or damage insured by this Policy. |
| 4.02.05.01.02.01.-04. | In addition to the exclusions elsewhere in this | Any increase in Time Element **loss** due to: suspension, cancellation or lapse of any lease, contract, license or |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| | Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | orders; fines or damages for breach of contract or for late or non-completion of orders; penalties of any nature; or any other consequential or remote factors. |
| 4.02.05.01.03. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any **loss** resulting from loss or damage to **Finished Stock**, nor the time required for their reproduction. |
| 4.02.05.01.04. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any Time Element **loss** due to physical loss or damage not insured by this Policy on or off the Insured Location.<br><br>However, in the event that a **Suspension** is due to a **Covered Cause of Loss** and during such **Suspension** a loss that is otherwise excluded occurs, the Company will pay for the Time Element loss which is directly caused by the **Covered Cause of Loss** to Covered Property under this Policy. |
| 4.02.05.01.05. | In addition to the exclusions elsewhere in this Policy, the | Any Time Element **loss** resulting from damage to Property of Others; however this exclusion does not apply to Time Element loss suffered by the |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| | following exclusions apply to Time Element Coverage; This Policy does not insure against: | Insured as a direct result of the damage to Property of Others. |
| 5.02.06.01. | This Coverage does not insure the **costs** to remove: | Property Not Covered that is **Contaminated**; or the **Contaminant** in or on Property Not Covered, whether or not the **Contamination** results from direct physical loss or damage caused by a **Covered Cause of Loss**. This Coverage shall cover the costs of removal of **contaminated** Covered Property or the **Contaminant** in or on Covered Property only if the **Contamination**, due to the actual not suspected presence of **Contaminant(s)**, of the debris resulted from direct physical loss or damage caused by a **Covered Cause of Loss**. |
| 5.02.23. | This Coverage will not include | The fees and **costs** of attorneys, **Public Adjusters**, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them, nor the fees and costs of loss consultants who provide consultation on coverage or negotiate claims. |
| Amendatory Endorsement – Massachusetts, § | The Company will not pay for | **Loss**, damage or **costs** under this endorsement until the amount of loss, damage or costs exceed $1,000. The |

| **Provision** | **Lead-In Language** | **Exclusion** |
|---|---|---|
| C.d. | | Company will then pay the amount of loss, damage or costs in excess of $1,000 up to the applicable limit, subject to all applicable provisions of A. above. This deductible applies whenever there is a **"release of heating oil"** covered under this endorsement. No other deductible will apply to the coverage provided solely by this endorsement. |
| Cyber Event Coverage Endorsement, § D.4. | The following additional exclusions apply to D. 1., 2., and 3. | We will not pay for **loss** or damage to **Digital Assets** resulting from: errors or omissions in programming, processing or copying; or correcting any deficiencies or problems including remediation of **Digital Asset** errors or vulnerabilities that existed prior to the **Cyber Event** and the Insured failed to correct. |
| Cyber Event Coverage Endorsement, § D.4. | The following additional exclusions apply to D. 1., 2., and 3. | We do not cover expenses or **costs** of **Cyber Extortion Payments**. |

203. Accordingly, the Policy's Contamination Exclusion does not bar coverage for any of Detroit Entertainment's losses arising from Coronavirus or COVID-19.

204. The Contamination Exclusion also applies only to traditional environmental pollution. Neither COVID-19 nor Coronavirus are traditional

environmental pollution and, as such, the Contamination Exclusion does not apply to losses caused by COVID-19 or Coronavirus.

205. The Contamination Exclusion, within its text, contains express exceptions for certain of the Policy's coverages but contains no exception for the ICD Coverage. Nor does the ICD Coverage state that it is an exception to the Contamination Exclusion. As such, the Contamination Exclusion cannot be applied to any claim under the Policy arising from a virus causing a communicable disease because doing so would nullify the ICD Coverage – a result proscribed by Michigan state law.

206. Upon information and belief, prior to the sale and issuance of the Policy, AGLIC was aware of exclusions being used in the insurance industry that purported to expressly exclude loss from "pandemic" or "pandemics" ("Pandemic Exclusions").

207. Upon information and belief, AGLIC was aware of the risk of an infectious viral pandemic such as Middle East respiratory syndrome ("MERS"), severe acute respiratory syndrome ("SARS") and Avian influenza prior to selling and issuing the Policy. Nonetheless no Pandemic Exclusions appear in the Policy.

*The Virus Deletion Endorsement*

208. The Contamination Exclusion is deleted in the Policy by endorsement (the "Virus Deletion Endorsement") and replaced with the following exclusionary

provision: "**Contamination** or asbestos, and any cost due to **Contamination** or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." *See* Policy Endorsement, form EDGE-219-C (01/18), Ex. 71.

209. AGLIC and/or its affiliate drafted the Virus Deletion Endorsement.

210. Detroit Entertainment had no role in negotiating or drafting the Virus Deletion Endorsement.

211. The Virus Deletion Endorsement is a pre-printed form in the Zurich EDGE™ form.

212. The Virus Deletion Endorsement is added to the Policy by endorsement, and by its express terms it applies to all risks located throughout the U.S. and is not limited to property located in Louisiana or to a specific geographic area.

213. The Virus Deletion Endorsement also deletes and replaces the definitions for **Contamination (Contaminated)** and **Contaminant(s)**, as follows:

- In the Policy (prior to Virus Deletion Endorsement), AGLIC defined **Contamination (Contaminated)** as: "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew."

- In the Policy (prior to Virus Deletion Endorsement), AGLIC also defined **Contaminant(s)** as: "Any solid, liquid, gaseous, thermal or

other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**."

- The Virus Deletion Endorsement in the Policy replaces the definition of **Contamination(Contaminated)** with: "Any condition of property due to the actual presence of any **Contaminant(s).**"

- The Virus Deletion Endorsement replaces the definition of **Contaminant(s)** in the Policy with: "Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**."

214. The Virus Deletion Endorsement thus removes "virus" from the sweep of the Contamination Exclusion.

215. Section 6.20 of the Policy (known as the "Titles Provision") states that "The titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate."

216. AGLIC and/or its affiliate drafted the Titles Provision of the Policy.

217. Detroit Entertainment had no role in drafting or negotiating the Titles Provision of the Policy.

218. The only time the word "Louisiana" appears in the Virus Deletion Endorsement is in the endorsement's title.

219. None of the provisions in the Virus Deletion Endorsement references Louisiana.

220. None of the provisions in the Virus Deletion Endorsement states that the endorsement, or any portions thereof, applies only to property risks or locations in Louisiana.

221. Additionally, the Virus Deletion Endorsement states that it modifies the Policy in its entirety, providing in bolded, all capitalized lettering, "**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**" (emphasis in original).

222. Other endorsements to the Policy, however, contain limitations that cabin those endorsements to just the specific state in their title.

223. For example, the Policy contains a New York state-titled endorsement, entitled "Amendatory Endorsement – New York," which provides "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK**" (emphasis in original).

224. Similarly, the Policy contains a Connecticut state-titled endorsement, entitled "Amendatory Endorsement – Connecticut," which provides "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT**" (emphasis in original).

225. AGLIC has issued policies containing the Virus Deletion Endorsement to policyholders who have no Insured Locations, as that term is defined in Section 2.01 of the Zurich EDGE™ form, located in the state of Louisiana.

226. Upon information and belief, AGLIC included the Virus Deletion Endorsement in all policies containing the Zurich EDGE™ form that it issued in December 2019 to policyholders who have no Insured Locations, as that term is defined in Section 2.01 of the Zurich EDGE™ form, located in the state of Louisiana.

227. Upon information and belief, AGLIC has issued policies containing the Virus Deletion Endorsement to policyholders who have no **Locations**, as that term is defined in the Zurich EDGE™ form, located in the state of Louisiana.

228. Upon information and belief, AGLIC included the Virus Deletion Endorsement in all policies containing the Zurich EDGE™ form that it issued in 2020 to policyholders who had no **Locations**, as that term is defined in the Zurich EDGE™ form, located in the state of Louisiana.

229. Detroit Entertainment has no Insured Locations located within the State of Louisiana.

230. Upon information and belief, AGLIC included the Virus Deletion Endorsement in all policies containing the Zurich EDGE™ form that it issued in December 2019.

*Zurich's Efforts to Change the Virus Deletion Endorsement*

231. Upon information and belief, when Zurich (AGLIC's ultimate parent company) faced escalating claims and lawsuits against it under the Zurich EDGE™

form, it knew that, by virtue of the Virus Deletion Endorsement, the Zurich EDGE™ form did not exclude coverage for losses arising from Coronavirus or COVID-19. As a result, Zurich tried, but failed, to re-insert the word "Virus" back into the Contamination Exclusion. In response and ***after*** AGLIC sold the Policy, Zurich pivoted, seeking and obtaining regulatory approval to add a geographic limitation into the Virus Deletion Endorsement that expressly limited it to only locations in Louisiana. The geographic limitation does not apply to or appear in the Policy.

232. For example, in December 2019, just after the emergence of the first COVID-19 cases in China, Zurich filed a regulatory request to modify its policy language. Buried in the edits, and without reference to the significance of the change, Zurich's filing sought to add an exclusion for Virus, which it sought to become effective in July 2020.

233. Further, Zurich has recently been seeking regulatory approval for a new EDGE™ II Policy form, which would re-insert the word "Virus" into the Virus Deletion Endorsement and therefore re-insert Virus into the Contamination Exclusion. At least one state regulator disapproved of the form in 2020.[153]

---

[153] *See* Ex. 72 (New York EDGE II Filing) at 2, 6 (submitted to New York on April 3, 2020; disapproved on September 22, 2020). This document was retrieved from the System for Electronic Rate and Form Filing (SERFF) created by the National Association of Insurance Commissioners (NAIC) for submitting and accessing filings. SERFF is the official system used by most states in the U.S.

234. Having failed to win approval for the EDGE™ II policy form that bore the Virus exclusion and reeling from the wave of COVID-19 claims and lawsuits it faced, Zurich went back to the regulators. This time, Zurich sought and obtained approval for a change to its EDGE™ form policy's Virus Deletion Endorsement to add a geographic limitation to the endorsement to limit its application to only locations in Louisiana – a limitation that does not exist in the Policy issued to Detroit Entertainment.

235. The Virus Deletion Endorsement was the only one of the EDGE™ policy form's many endorsements that, since the emergence of Coronavirus and COVID-19, Zurich ever sought or obtained regulatory approval to amend.

236. In its explanatory memo, where it disclosed to the regulators what amendments to the Virus Deletion Endorsement it was seeking to make, Zurich explained that it was making one change – to a minor aspect of premium refunds – and (outside of attaching a redline of the proposed amendments to the Virus Deletion Endorsement) failed to explain or mention that it was also adding a geographical limitation to the endorsement.

237. Further, in the Fall of 2020, after it began receiving claims for losses sustained as a result of Coronavirus and COVID-19 and the physical loss of or damage to property that they cause, and the accompanying government closure orders (collectively, "COVID Losses") and after being sued across the United States,

Zurich sought and received approval for a revised Louisiana endorsement to the Zurich EDGE™ form.[154] In its regulatory filing, Zurich described the proposed amendment as follows:

> Pursuant to La. Stat. § 22:885(B), Zurich North America and all affiliated companies are updating Louisiana Amendatory Endorsements. **The change removes language concerning premium refunds** attributable to mortgagees when there is a policy cancellation. **The only changes are those in the above referenced code.**

Ex. 73 at 3, 13 (emphasis added).

238. However, in addition to removing the language concerning premium refunds and without flagging the addition for the regulator, Zurich also added: "**THIS ENDORSEMENT ONLY APPLIES TO LOCATIONS IN LOUISIANA**." *Id.* at 14. This geographically limiting language is absent in the Virus Deletion Endorsement contained in the Policy and in other Zurich EDGE™ form policies for which Zurich has denied coverage for COVID-19 Losses across the country and around the globe. It is also the only amendment to the Zurich EDGE™ policy form that Zurich has sought and received since the emergence of Coronavirus, COVID-19, and the ensuing massive COVID-19 Losses.

---

[154] *See* Ex. 73 (Louisiana EDGE Endorsement Filing, the "Modified Louisiana Endorsement") at 2, 6 (submitted to Louisiana on August 31, 2020; approved on September 8, 2020). This document was also retrieved from SERFF. *See also* Ex. 74 (Modified Louisiana Endorsement as filed as an exhibit to the complaint in *Watson Woods Healthcare, Inc., et al. v. Zurich Am. Ins. Co.*, No. 1:21-cv-01150 (N.D. Ill.)).

239. Zurich's various efforts to add a geographic limitation to the Virus Deletion Endorsement, after AGLIC issued the Policy, demonstrates Zurich's own recognition that the Virus Deletion Endorsement present in the Policy applies policy wide regardless of location and that Virus is not excluded from coverage by the Policy's Contamination Exclusion. Indeed, in 2020-2021, AGLIC issued policies containing this exact Louisiana geographic limiting language in the Virus Deletion Endorsement to similarly situated policy holders who do not own insured property in Louisiana.[155]

**4. Detroit Entertainment's Covered Losses**

240. Detroit Entertainment has sustained and is sustaining a substantial Time Element loss of its "gross earnings" as insured under the Policy for MotorCity.

241. Detroit Entertainment is also incurring significant Extra Expense as insured under the Policy in order to resume and continue as nearly as practicable Detroit Entertainment's normal business activities that otherwise would be necessarily suspended due to the direct physical loss of or damage to its property (the MotorCity complex).

242. Detroit Entertainment has also incurred substantial expenses for the

[155] *See, e.g.*, Ex. 75, (Modified Louisiana Endorsement as filed as an exhibit to the complaint in *Kaleida Health v. American Guarantee and Liability Insurance Company*, No. 803098/2022 (N.Y. Sup. Ct. Mar. 15, 2022)).

Protection and Preservation of Property as insured under the Policy in order to temporarily protect or preserve Detroit Entertainment's Covered Property. These expenses were necessary due to the actual or imminent physical loss or damage to Detroit Entertainment's Insured **Location.**

243. Detroit Entertainment also expects that when the calculation of its full losses is fully known, additional coverages under the Policy may be applicable. The foregoing is not a comprehensive discussion of all potentially applicable coverages, terms, and conditions, which are fully set forth in the Policy.

**M. AGLIC's Effective Denial of the Detroit Entertainment Claim**

244. On or about March 23, 2020, Detroit Entertainment gave notice to AGLIC of the Detroit Entertainment Claim. Additional information was provided on or about April 24, 2020, specifically referencing its losses relating to "Coronavirus, government orders, direct physical loss of or damage and Time Element."

245. AGLIC never sent an adjuster – or anyone on its behalf – to visit, inspect or set foot in MotorCity to investigate the Detroit Entertainment Claim.

246. Instead, AGLIC's parent company, Zurich, has waged a public relations campaign to discourage and deter policyholders from bringing business interruption claims.

247. On or about May 14, 2020, Zurich's CFO George Quinn announced

Zurich's position that virtually all (more than 99%) of its policies in the United States exclude losses for virus (even though its broadly marketed EDGE™ form does not exclude virus losses). He further claimed that Zurich's worldwide business interruption claims due to COVID-19 would be about $450 million (60% of $750 million) in 2020, with the bulk of those claims payments being in Europe.[156]

248. Finally, more than nine months after first receiving notice of the Detroit Entertainment Claim, on December 31, 2020 – New Year's Eve – AGLIC issued a coverage letter reserving AGLIC's rights to deny coverage on various grounds, and effectively denying coverage insofar as AGLIC has still not agreed to provide the urgently needed coverage.

249. Among other things, AGLIC asserted in its December 31, 2020 letter that "it does not appear that the presence of the COVID-19 virus constitutes direct physical loss or damage to property" – ignoring the mounting evidence to the contrary, and mischaracterizing the applicable policy language.

250. AGLIC leaped to this conclusion despite never visiting or sending an

[156] *Zurich Q1 update – resilient performance while serving customers and protecting colleagues*, Media Release, ZURICH (May 14, 2020), https://www.zurich.com/en/media/news-releases/2020/2020-0514-01 (last visited May 17, 2022); *see also* L.S. Howard, *Zurich Insurance Estimates Coronavirus Pandemic Claims to Hit $750 Million for 2020*, INS. J. (May 14, 2020), https://www.insurancejournal.com/news/international/2020/05/14/568567.htm (last visited May 17, 2022).

adjuster to MotorCity to verify the accuracy of this assertion and despite Zurich's website postings about the physical nature of Coronavirus and how "proper cleaning and disinfection of surfaces can help minimize the spread of the virus" – postings that remain on Zurich's website even today.[157]

251. AGLIC also cited the Contamination Exclusion as a basis for denying coverage, asserting that "[t]he presence of the COVID-19 virus falls within the definition of **Contamination**" – in so doing, AGLIC ignored and failed to mention the Policy's Virus Deletion Endorsement.

252. AGLIC also disputed that the relevant Civil Authority Orders were issued "as a result of direct physical loss of or damage to property" for CIVIL OR MILITARY AUTHORITY coverage – ignoring the context of the relevant orders and the science regarding transmission of COVID-19, discussed herein.

253. AGLIC cited additional coverage exclusions that do not apply to Detroit Entertainment's losses, and misrepresented the INTERRUPTION BY COMMUNICABLE DISEASE coverage.

254. While not offering to investigate the losses or provide coverage by any particular date certain, AGLIC nevertheless refused to extend the one-year deadline

---

[157] *Cleaning and Disinfecting Plans During COVID-19 Outbreak,* ZURICH (May 19, 2020), https://www.zurich.com/en/knowledge/topics/covid-19/cleaning-and-disinfecting-plans-during-ovid-19-outbreak (last visited May 17, 2022).

under the Policy for Detroit Entertainment to file a coverage action.

255. AGLIC finally acknowledged limited coverage, on February 1, 2021, of up to $100,000 under the Policy's INTERRUPTION BY COMMUNICABLE DISEASE coverage. Again, AGLIC cited the Contamination Exclusion as a basis for denying coverage for everything other than this small drop in the bucket of Detroit Entertainment's losses, without even mentioning the Policy's Virus Deletion Endorsement. AGLIC also continued to deny that the presence of the COVID-19 virus constitutes direct physical loss of and/or damage to property. AGLIC also persisted in citing inapplicable coverage exclusions.

256. Again, AGLIC refused to extend the one-year deadline under the Policy for Detroit Entertainment to file a coverage action, thus forcing Detroit Entertainment to bring the instant action to preserve its coverage rights.

**FIRST CLAIM FOR RELIEF**
**<u>(Declaratory Judgment)</u>**

257. Detroit Entertainment incorporates the above Paragraphs by reference.

258. This is a claim for relief for declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201. An actual and justiciable controversy exists between Detroit Entertainment and AGLIC concerning their respective rights and obligations under the Policy.

259. The issuance of declaratory relief will terminate the controversy

between Detroit Entertainment and AGLIC that gave rise to this action.

260. As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and obligations of Detroit Entertainment and AGLIC under the Policy.

261. Detroit Entertainment seeks a declaratory judgment declaring that the Policy covers the losses it has suffered.

262. Detroit Entertainment seeks a declaratory judgment declaring that AGLIC is responsible for fully and timely paying the Detroit Entertainment Claim.

263. The burden of proof is upon AGLIC to demonstrate that coverage is limited in any way under the Policy.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**

264. Detroit Entertainment incorporates the above Paragraphs by reference.

265. The Policy is a valid and enforceable contract.

266. Detroit Entertainment paid substantial premiums for the Policy and the promises of coverage contained therein, and otherwise performed all of its obligations owed under the Policy or was excused from performance.

267. AGLIC has denied or effectively denied Detroit Entertainment's claims and has refused to pay or otherwise honor its promises. In denying coverage for Detroit Entertainment's insurance claim as alleged above, AGLIC breached the

contract (that is, the Policy). As a direct and proximate result of AGLIC's breaches, Detroit Entertainment has suffered and continues to suffer damage in an amount to be proven at trial but currently estimated to exceed $270 million in lost gaming revenue as well as substantial additional losses.

268. Consequential damages for breach of the Policy were reasonably contemplated by the parties when AGLIC issued the Policy.

## PRAYER FOR RELIEF

WHEREFORE, Detroit Entertainment respectfully requests that the Court enter Judgment in its favor against Defendant as follows:

A. On the First Claim for Relief, a declaratory judgment that the losses Detroit Entertainment has suffered are covered by the Policy and that Defendant is responsible for fully and timely paying Detroit Entertainment's losses;

B. On the Second Claim for Relief, for an award of damages in favor of Detroit Entertainment in an amount to be proven at trial, plus pre- and post-judgment interest at the maximum legal rate, attorney's fees, costs and disbursements for this action; and

C. For such other equitable and further relief as this Court deems just and proper.

Dated: June 2, 2022

Respectfully submitted,

HONIGMAN LLP

By: /s/ J. Michael Huget
J. Michael Huget (P39150)
Andrea Hansen (P47358)
Adam M. Wenner (P75309)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Tel: (313) 465-7000
mhuget@honigman.com
ahansen@honigman.com
awenner@honigman.com

PILLSBURY WINTHROP SHAW
PITTMAN LLP
Joseph D. Jean
Janine M. Stanisz
Scott D. Greenspan
31 West 52nd Street
New York, New York 10019
Tel: (212) 858-1000
joseph.jean@pillsburylaw.com
janine.stanisz@pillsburylaw.com
scott.greenspan@pillsburylaw.com

*Attorneys for Plaintiff*
*Detroit Entertainment, L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2022, I electronically filed the foregoing document and this certificate of service with the Clerk of the Court using the ECF filing system, which will send notification of such filing to the attorneys of record. I declare under penalty of perjury that these statements are true to the best of my information, knowledge, and belief.

Dated: June 2, 2022 By: /s/ J. Michael Huget