UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DETROIT ENTERTAINMENT, LLC,

       Plaintiff,                              Case No. 21-cv-10661

                                              Hon. Matthew F. Leitman

v.

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY,

       Defendant.

_____/

## <u>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (ECF No. 46)</u>

Plaintiff Detroit Entertainment, LLC owns and operates the MotorCity Casino Hotel ("MotorCity") in Detroit, Michigan. In 2020, Detroit Entertainment insured MotorCity under an "all risk" commercial insurance policy (the "Policy") issued by Defendant American Guarantee and Liability Insurance Company ("AGLIC"). During that same year, Detroit Entertainment sought coverage under the Policy for losses it claimed to have suffered as a result of the COVID-19 pandemic. Detroit Entertainment said that it was entitled to that coverage because the COVID-19 virus caused physical damage to its property. AGLIC denied coverage for several reasons, including that the Policy excluded coverage for losses caused by the presence of a virus on Detroit Entertainment's premises.

1

On February 25, 2021, Detroit Entertainment filed this action against AGLIC. (*See* Compl., ECF No. 1-2; Sec. Am. Compl., ECF No. 44.)  Detroit Entertainment alleges that AGLIC wrongfully denied its claim for insurance coverage. (*See id.*)  AGLIC has now moved to dismiss Detroit Entertainment's claims. (*See* Mot. to Dismiss, ECF No. 46.)

The Court will **GRANT** the motion and will **DISMISS** Detroit Entertainment's Second Amended Complaint **WITH PREJUDICE**.  All of the losses claimed by Detroit Entertainment were allegedly caused by the presence of the COVID-19 virus on its property, and, as noted above, the Policy excludes coverage for such losses. Thus, AGLIC did not breach the terms of the Policy when it denied Detroit Entertainment's claim for coverage.

## I

## A

"Detroit Entertainment owns and operates" MotorCity. (Sec. Am. Compl. at ¶1, ECF No. 44, PageID.2186.)  MotorCity is "an award-winning and innovative entertainment complex in Detroit, Michigan." (*Id.*)  At all times relevant to this action, Detroit Entertainment obtained insurance coverage for MotorCity from AGLIC. (*See id.* at ¶22, PageID.2196.)   "AGLIC is a member of the Zurich group of insurance companies – one of the world's largest" insurance companies. (*Id.* at ¶2, PageID.2186.)

2

**B**

The Policy that Detroit Entertainment purchased from AGLIC is what is known as an "all risk" commercial insurance policy. (*Id.* at ¶22, PageID.2196.) The Policy "cover[s] not only more commonly occurring risks like fire, but also entirely unanticipated and novel risks that may arise." (*Id.*) The Policy "insures against," among other things, "direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property." (Policy at § 1.01, ECF No. 44-2, PageID.2339.) In addition, the Policy covers losses that "result from" the "suspension" of an insured's business "due to direct physical loss of or damage to property […] caused by a Covered Cause of Loss." (*Id.* at § 4.01.01, PageID.2350.) The Policy defines a "Covered Cause of Loss" as "[a]ll risks of direct physical loss of or damage from any cause unless excluded." (*Id.* at § 7.11, PageID.2384.)

One of the Policy's exclusions is the "Contamination Exclusion." (*See id.* at § 3.03.01.01, PageID.2347.) That exclusion bars coverage for losses caused by "Contamination, and any cost due to Contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." (*Id.*) "Contamination" includes "[a]ny condition of property due to the actual presence of," among other things, "virus[es and] disease causing or illness causing agent[s]." (*Id.* at § 7.09, PageID.2384.)

3

**C**

"On March 10, 2020, Governor Gretchen Whitmer announced the first presumptive positive cases of COVID-19 in the state [of Michigan]." (Sec. Am. Compl. at ¶77, ECF No. 44, PageID.2233.)   She then "declared a state of emergency." (*Id.*)   "By mid-March 2020, Coronavirus and COVID-19 had spread rapidly throughout the area, with numerous new infections and deaths reported daily, as well as the closure of businesses and cancellation of events." (*Id.*, PageID.2234.)

COVID-19 also "caused widespread physical loss of or damage to property in the Detroit area and throughout Michigan," including at MotorCity. (*Id.* at ¶78, PageID.2234-2235.)   Detroit Entertainment insists that MotorCity was "repeatedly and continuously exposed to, invaded by, actually physically damaged and physically and materially altered by the presence of the airborne Coronavirus from infected patrons and employees." (*Id.* at ¶109, PageID.2247.)   As "a result of [this alleged] direct physical loss of or damage to property caused by Coronavirus and COVID-19, and as a result of the loss of the ability to operate [MotorCity] in its normal and customary manner" (*id.* at ¶116, PageID.2250), Detroit Entertainment "closed [MotorCity] to the general public on March 16, 2020." (*Id.* at ¶114, PageID.2249.)   While Detroit Entertainment has since "resumed operations of its various amenities" at MotorCity, it has done so with "operational adjustments, including limitations on [its] hours of operation." (*Id.*, PageID.2250.)   Detroit

Entertainment says that its losses from closing MotorCity, limiting its operations, and undertaking substantial and costly mitigation efforts to "protect and preserve [its] property from further damage or loss," exceeded "$270 million." (*Id.* at ¶119, PageID.2251.)

### D

"On or about March 23, 2020, Detroit Entertainment gave notice to AGLIC of [its] claim" for insurance coverage "arising from its losses from Coronavirus and COVID-19." (*Id.* at ¶¶ 198, 244, PageID.2292, 2310.)   On December 31, 2020, "AGLIC issued a coverage letter reserving AGLIC's rights to deny coverage on various grounds, and effectively denying coverage insofar as AGLIC has still not agreed to provide the urgently needed coverage." (*Id.* at ¶248, PageID.2311.)

Two of AGLIC's reasons for denying coverage are relevant here.   First, AGLIC asserted that Detroit Entertainment was not entitled to coverage because "the presence of the COVID-19 virus [did not] constitute[] direct physical loss or damage to property." (*Id.* at ¶249, PageID.2311.)   Second, AGLIC said that even if Detroit Entertainment had suffered a "direct physical loss or damage to [its] property," it was still not entitled to coverage because "[t]he presence of the COVID-19 virus [fell] within the definition of Contamination" and Detroit Entertainment's losses were therefore excluded from coverage under the Contamination Exclusion. (*Id.* at ¶251, PageID.2312.)

Roughly one month after AGLIC reserved its right to entirely deny coverage, AGLIC concluded that Detroit Entertainment was actually entitled to limited coverage under the Policy.   More specifically, on February 1, 2021, AGLIC "acknowledged" that Detroit Entertainment was entitled to coverage "of up to $100,000 under the Policy's INTERRUPTION BY COMMUNICABLE DISEASE coverage." (*Id.* at ¶255, PageID.2313.)  That coverage was described in a standalone endorsement to the Policy. (*See* Endorsement, ECF No. 45-32.)  The endorsement stated, among other things,  that AGLIC "would pay for the actual Gross Earnings loss sustained by the Insured […] resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension [was] caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease." (*Id.*)  And it provided that "[t]his Coverage will not apply to loss or damage that is payable under any other provision in this Policy." (*Id.*)

Even though AGLIC had otherwise denied coverage, it provided the limited coverage under the communicable disease provision because (1) coverage under that provision did not require a direct physical loss to Detroit Entertainment's property and (2) the Contamination Exclusion did not apply to that provision.  When AGLIC provided coverage under the communicable disease provision, it reiterated that "the

Contamination Exclusion [w]as a basis [to] deny[] coverage for everything other than" the Policy's interruption by communicable disease coverage. (Sec. Am. Compl. at ¶255, ECF No. 44, PageID.2313.)

**E**

After AGLIC denied the majority of Detroit Entertainment's claim, Detroit Entertainment filed this action against AGLIC in the Wayne County Circuit Court for the State of Michigan. (*See* Compl., ECF No. 1-2.)  AGLIC then removed this action to this Court. (*See* Notice of Removal, ECF No. 1.)  In its Notice of Removal, AGLIC explained that this Court has diversity jurisdiction over this action under 28 U.S.C. §1332(a). (*See id.*, PageID.2-3.)

Following removal, AGLIC moved to dismiss Detroit Entertainment's Complaint. (*See* Mot., ECF No. 13.)  Instead of ruling on that motion, the Court granted Detroit Entertainment leave to file a First Amended Complaint. (*See* Order, ECF No. 16.)  The Court explained that it was granting leave to amend so that Detroit Entertainment could "remedy the alleged deficiencies in its claims identified by [AGLIC] in the motion to dismiss." (*Id.*, PageID.374.)  It further instructed Detroit Entertainment to "allege [in the First Amended Complaint] any and all additional facts, currently known to it, that may cure the alleged deficiencies in its claims." (*Id.*)

Detroit Entertainment filed its First Amended Complaint on May 24, 2021. (*See* First Am. Compl., ECF No. 18.)  AGLIC then moved to dismiss that pleading. (*See* Mot., ECF No. 21.)  While that motion was pending, the United States Court of Appeals for the Sixth Circuit issued a published decision – *Brown Jug, Inc. v. Cincinnati Insurance Company*, 27 F.4th 398 (6th Cir. 2022) – that provided important guidance concerning what constitutes a "direct physical loss" under the Policy. In light of *Brown Jug*, the Court decided to allow Detroit Entertainment to file a Second Amended Complaint so that it could "revise and supplement its allegations" based on that decision. (Order, ECF No. 39, PageID.2085.)

Detroit Entertainment filed its Second Amended Complaint, the operative pleading in this action, on June 2, 2022. (*See* Sec. Am. Compl., ECF No. 44.)  The Second Amended Complaint includes two Counts.  In Count I, Detroit Entertainment "seeks a declaratory judgment declaring that AGLIC is responsible for fully and timely paying" Detroit Entertainment's insurance claim. (*Id.* at ¶262, PageID.2314.) In Count II, Detroit Entertainment seeks damages for AGLIC's alleged breaches of the Policy. (*See id.* at ¶¶ 264-268, PageID.2314-2315.)

AGLIC moved to dismiss the Second Amended Complaint on July 12, 2022. (*See* Mot., ECF No. 46.)  The parties thereafter filed supplemental briefs. (*See* Supp. Brs., ECF Nos. 54, 55.)  The Court has carefully reviewed the parties' submissions

and concludes that it may resolve the motion without oral argument. (*See* Order, ECF No. 57.)

## II

## A

AGLIC moves to dismiss Detroit Entertainment's claims under Federal Rule of Civil Procedure 12(b)(6).  "To survive a motion to dismiss" under Rule 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id*.  When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  "Mere conclusions," however, "are not entitled to the assumption of truth.  While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## B

Michigan law governs this diversity action. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). The principles of construing insurance policies under Michigan law are "well-settled." *Turek Enterprises, Inc. v. State Farm Mut. Auto. Co.*, 484 F.Supp.3d 492, 498 (E.D. Mich. 2020). In *Turek*, another Judge of this Court explained those principles as follows:

> "[A]n insurance contract must be enforced in accordance with its terms." *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 596 N.W.2d 190, 193 (1999). "Terms in an insurance policy must be given their plain meaning and the court cannot create an ambiguity where none exists." *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 534 N.W.2d 502, 505 (1995) (internal quotation marks omitted). Michigan defines "an ambiguity in an insurance policy to include contract provisions capable of conflicting interpretations." *Auto Club Ins. Ass'n v. DeLaGarza*, 433 Mich. 208, 444 N.W.2d 803, 805 (1989). Ambiguous terms "are construed against its drafter and in favor of coverage." *Id.* at 806.

> "Michigan courts engage in a two-step analysis when determining coverage under an insurance policy: (1) whether the general insuring agreements cover the loss and, if so, (2) whether an exclusion negates coverage." *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 821 (6th Cir. 2018) (citing *Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377, 565 N.W.2d 839, 841 (1997)).

10

*Id.* at 498-499. *See also Kirsch, DDS v. Aspen Am. Ins. Co.*, 2020 WL 7338570, at ** 2-3 (E.D. Mich. Dec. 14, 2020) (same).

Under Michigan law, an insurer "bear[s] the burden of showing that any exclusion to coverage applie[s]." *Turek*, 484 F.Supp.3d at 503. Such "[i]nsurance exclusion clauses are to be construed strictly and narrowly." *RealComp II, Ltd. v. Ace American Ins. Co.*, 46 F.Supp.3d 736, 741 (E.D. Mich. 2014). However, "clear and unambiguous exclusions in insurance policies" should be enforced. *Id. See also Turek*, 484 F.Supp.3d at 499 ("Policy provisions, such as exclusions, are valid as long as [they are] clear, unambiguous and not in contravention of public policy") (internal quotation marks omitted).

### III

### A

In the briefing before the Court, the parties vigorously dispute whether Detroit Entertainment suffered the type of "direct physical loss of or damage to [its] property" necessary to trigger coverage under the Policy. AGLIC argues that Detroit Entertainment is "not entitled" to coverage because it "has not sustained a tangible loss or damage to its property." (Mot., ECF No. 46, PageID.3305.) AGLIC insists that "the mere presence of [COVID-19]" within MotorCity did not amount to "'direct physical loss of or damage to' property" because the virus did "not physically or directly alter property." (*Id.*, PageID.3306-3307.) Detroit

Entertainment counters that COVID-19 did cause a "direct physical loss of or damage to" its property. (Resp., ECF No. 48, PageID.3442.)   It says that "Coronavirus deposited on myriad surfaces [at MotorCity] transformed them into disease-spreading fomites, which posed transmission risks for people in contact with such surfaces" and that "chemicals it used to try to remove Coronavirus from surfaces caused tangible damage to [its] property." (*Id.*, PageID.3445, 3449.)

The Court need not determine whether Detroit Entertainment has plausibly alleged that COVID-19 caused "direct physical loss of or damage to" its property. That is because even if Detroit Entertainment has done so, it still would not be entitled to coverage because, for the reasons explained below, its claimed losses fall under the Contamination Exclusion.   Where, as here, a policy exclusion plainly excludes coverage, it is appropriate for a court to bypass the question of whether an insured's losses fall within a coverage provision of a policy and to proceed directly to the exclusion. *See Lindenwood Female Coll. v. Zurich Am. Ins. Co.*, --- F.4th ---, 2023 WL 2320670, at ** 1-2 (8th Cir. Mar. 2, 2023) (explaining that court "need to not resolve" whether insured had sufficiently alleged that COVID-19 caused "physical loss" or "physical damage" to property because the insurance policy at issue contained a contamination exclusion that "clearly and unambiguously bar[red] coverage"); *Stanford Dental, PLLC v. The Hanover Ins. Grp.*, 518 F.Supp.3d 989,

996 (E.D. Mich. 2021) (proceeding directly to question of whether virus exclusion in insurance policy precluded coverage).[1]  The Court does so below.

## B

AGLIC argues that "the Contamination Exclusion bars all [insurance] coverage" sought by Detroit Entertainment in this action. (Mot., ECF No. 46, PageID.3317.)  The Court agrees.  As explained above, the Contamination Exclusion precludes coverage for "Contamination, and any cost due to Contamination." (Policy at ¶ 3.01.01, ECF No. 44-2, PageID.2347.)  And the Policy defines "Contamination" as, among other things, "[a]ny condition of property due to the actual presence of … virus[es and] disease causing or illness causing agent[s]." (*Id.* at ¶ 7.09, PageID.2384.)  It is undisputed that COVID-19 is a "virus" and that all of Detroit Entertainment's claimed losses were caused by the alleged presence of COVID-19 at MotorCity.  For those reasons, the Contamination Exclusion precludes Detroit Entertainment's claim for coverage.

Indeed, Detroit Entertainment does not even attempt to argue that its claimed losses fall outside the scope of the Contamination Exclusion.  And for good reason. The vast majority of courts – including the Sixth Circuit – that have reviewed the

---

[1] *See also Captain Skrip's Off. LLC v. Conifer Holdings, Inc.*, 546 F.Supp.3d 660, 664 (E.D. Mich. 2021) (proceeding directly to question of whether virus exclusion barred coverage); *Vizza Wash, LP v. Nationwide Mut. Ins. Co.*, 496 F.Supp.3d 1029, 1039 (W.D. Tex. Oct. 26, 2020) (same).

Contamination Exclusion (or an exclusion materially indistinguishable from it) have concluded that the exclusion precludes coverage for losses caused by the presence of COVID-19 on an insured's property. *See*, *e.g.*, *Dana Inc. v. Zurich Am. Ins. Co.*, 2022 WL 2452381, at *4 (6th Cir. July 6, 2022) (reviewing similar contamination exclusion, rejecting argument that "the contamination exclusion does not apply here because the exclusion […] does not include COVID-19," and noting that "the actual or suspected presence of COVID-19 on [plaintiff's] property is contamination as defined by the policy"); *Lindenwood Female Coll.,* --- F.4th ---, 2023 WL 2320670, at *2 (holding the same exclusion bars coverage for losses caused by presence of COVID-19 on insured's property); *Greenwood Racing, Inc. v. AGLIC*, 2022 WL 4133295, at *5 (E.D. Pa. Sept. 12, 2022) (examining same contamination exclusion and concluding that "[e]ven if the Coronavirus and resulting government actions caused direct physical loss or damage to [plaintiff's] properties, the Policies' Contamination Exclusion bars [plaintiff's] claims" because "[t]he Coronavirus—a virus—unambiguously falls within this exclusion, something many other courts have also concluded"); *Boscov's Dep't Store, Inc. v. AGLIC*, 546 F.Supp.3d 354, 368 (E.D. Pa. 2021) (reviewing same contamination exclusion and concluding that "the definition of 'Contamination' [in the contamination exclusion] is unambiguous and certainly applies to COVID-19"); *NTT Data Int'l LLC v. Zurch Am. Ins. Co.*, 2022 WL 196533, at *7 (N.D. Tex. Jan 21, 2022) (examining similar contamination

exclusion and holding that "[b]ecause SARS-CoV-2 is a virus that causes COVID-19, the Contamination Exclusion bars coverage in this case").  This Court concurs in the conclusion reached by so many other courts that the Contamination Exclusion bars coverage for losses allegedly caused by the presence of the COVID-19 virus on an insured's property.

## C

Detroit Entertainment counters that the Contamination Exclusion does not preclude coverage for three reasons.  Detroit Entertainment's arguments do not persuade the Court that Detroit Entertainment is entitled to coverage under the Policy.

## 1

First, Detroit Entertainment argues that an endorsement to the Policy removes virus-caused damage from the scope of the Contamination Exclusion. (*See* Resp., ECF No. 48, PageID.3476-3477.)  The endorsement to which Detroit Entertainment directs the Court is one that the Policy calls the "Amendatory Endorsement – Louisiana" (the "Louisiana Endorsement") (Policy, ECF No. 44-2, PageID.2437-2439.)  The Louisiana Endorsement is one of more than thirty Policy endorsements that bear the name of a specific state. (*See id*., PageID.2411-2485.)  At the top of every one of these endorsements is "Amendatory Endorsement – [State name]." (*See*

15

*id.*)  These endorsements appear together toward the end of the Policy, and they are formatted identically. (*See id.*)

The initial text of the Louisiana Endorsement states that "this endorsement changes the Policy." (*Id.*, PageID.2437.)  The Louisiana Endorsement then identifies the Policy provisions that it modifies and/or deletes. (*See id.*)  One of those provisions is the Policy's definition of "Contamination."  As relevant here, the Louisiana Endorsement deletes the word "virus" from the definition of "Contamination."[2]  Detroit Entertainment insists that because the Louisiana Endorsement replaced the definition of Contamination with a new definition that *does not* include viruses, the Contamination Exclusion does not preclude its claim for coverage.

Detroit Entertainment recognizes that the words "Amendatory Endorsement – Louisiana" appear at the top of the Louisiana Endorsement, but Detroit

---

[2] As noted above, the definition of "Contamination" in the Policy is "[a]ny condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew" to "[a]ny condition of property due to the actual presence of any Contaminant(s)." (Policy at § 7.09, ECF No. 44-2, PageID.2384.)  The Louisiana Endorsement "delete[s]" that definition and "replace[s]" it with the following definition: "Any condition of property due to the actual presence of any Contaminant(s)." (*Id.*, PageID.2439.) Then, the Louisiana Endorsement excludes viruses and disease causing agents from the definition of the term "Contaminant."  It defines "Contaminant" as: "[a]ny solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores." (*Id.*)

Entertainment says that the endorsement nonetheless applies to the losses that it incurred in Michigan.  Detroit Entertainment's reasoning is as follows.  Detroit Entertainment highlights that the words "Amendatory Endorsement – Louisiana" are the mere "title" of the Louisiana Endorsement. (Resp., ECF No. 48, PageID.3477.) Detroit Entertainment then notes that a provision of the Policy states that titles "shall not in any way affect the provisions to which they relate." (*See id*., quoting Section 6.20 of the Policy, ECF No. 44-2, PageID.2380.)  Finally, Detroit Entertainment points out that the Louisiana Endorsement begins by stating that it "Changes the Policy," not by stating that it "Changes the Policy *in Louisiana*." (*See id*; emphasis added.)  The omission of a reference to Louisiana in the opening statement is noteworthy, Detroit Entertainment asserts, because other amendatory endorsements begin by stating that they "Change the Policy" in a specific state. (*See id*., PageID.3478, citing Amendatory Endorsement – New York."[3])  In short, Detroit Entertainment argues that the Louisiana Endorsement applies to losses incurred in any state because (1) the reference to Louisiana in the title of the endorsement has no effect and (2) AGLIC did not expressly limit the geographic scope of the endorsement to Louisiana.

---

[3] The Amendatory Endorsement – New York states that it "CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK." (Policy, ECF No. 44-2, PageID.2462.)

Detroit Entertainment's interpretation of the Louisiana Endorsement is "not frivolous." *Lindenwood Female Coll.*, --- F.4th ---, 2023 WL 2320670 at *2 (addressing the same argument).  But that interpretation cannot be correct for at least two reasons.

First, expanding the Louisiana Endorsement beyond Louisiana would create irreconcilable conflicts within the Policy.   That is because the Louisiana Endorsement and several of the other similarly-structured endorsements[4] – which, under Detroit Entertainment's reading of the Policy, would also apply to losses no matter where they were incurred – treat the same subjects differently.  By way of example, the Louisiana Endorsement and the Amendatory Endorsement – Alaska both purport to delete a Policy provision setting the deadline by which the insured must commence litigation against AGLIC, but the two endorsements replace that provision with *different* deadlines.  While the Louisiana Endorsement provides that "[l]egal action must be started within (24) twenty-four months after the date of direct physical loss or damage to Covered Property" (Policy, ECF No. 44-2, PageID.2438), the Amendatory Endorsement – Alaska allows a legal action to "be started within three (3) years after the date on which the cause of action accrues." (*Id.*,

---

[4] When the Court refers to "similarly-structured endorsements" above, it means endorsements that identify a specific state and then provide that they "Change the Policy."  Many of the endorsements in the same section of the Policy as the Louisiana Endorsement have this structure.

PageID.2413.)  Detroit Entertainment's broad reading of the Louisiana Endorsement is untenable because it creates conflicts like this.

Second, Detroit Entertainment's expansive construction of the Louisiana Endorsement turns significant portions of the Policy into surplusage.  The surplusage results from the fact that the Louisiana Endorsement and other similarly-structured endorsements – which, again, apply to losses in any state under Detroit Entertainment's reading of the Policy – make many of the *same* changes to the Policy.  For example, both the Louisiana Endorsement and the Amendatory Endorsement – Georgia include identical revisions to the section of the Policy discussed above that sets the deadline by which an insured must file suit. (*See id.*, PageID.2427, 2438.)  Likewise, several other amendatory endorsements that have the same structure as the Louisiana Endorsement have identical provisions.  For example, the Amendatory Endorsement – Maine, Amendatory Endorsement – Montana, and Amendatory Endorsement – Vermont all make the same revision to the section of the Policy that discusses "Concealment, Misrepresentation, or Fraud." (*See id.*, PageID.2450, 2456, 2478.)  It would make no sense to conclude – as Detroit Entertainment's reading of the Policy would require – that the drafters of the Policy repeatedly made the same revisions to the Policy across multiple amendatory endorsements.

Detroit Entertainment acknowledges that under its interpretation, the Policy contains repetitive amendatory endorsements that make the same changes. Detroit Entertainment argues that its reading of the Policy is nonetheless permissible and that the overlapping endorsements should simply be "enforced as written." (Resp. at n. 20, ECF No. 48, PageID.3480.) But this argument ignores the well-settled rule under Michigan law that a court must "avoid an interpretation that would render any part of [a] contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).[5]

The bottom line here is that "the only plausible way to harmonize the various provisions of the [Policy] is to read the [Louisiana Endorsement] as applying solely to property in Louisiana." *Carilion Clinic v. AGLIC*, 583 F.Supp.3d 715, 737 (W.D. Va. 2022) (rejecting the same reading of the Louisiana Endorsement offered by Detroit Entertainment). That is exactly what two circuit courts of appeals and several district courts have recently done.

---

[5] Avoiding surplusage means giving effect to "every word and every provision" and rejecting "an interpretation that causes [one provision] to duplicate another provision or to have no consequence." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 257 (6th Cir. 2020) (quotation omitted) (describing canon of statutory construction against adopting an interpretation that would render a provision surplusage). Under Michigan law, courts must avoid surplusage when interpreting both contracts and statutes. *See Klapp*, 663 N.W.2d at 453 (explaining that same rules against surplusage apply in contexts of statutory and contract interpretation).

The Eighth Circuit rejected Detroit Entertainment's broad reading of the Louisiana Endorsement just last week in *Lindenwood Female Coll.*, *supra*. The plaintiff-college in that case maintained a casualty insurance policy with Zurich American Insurance Company. *See id.* at *1. After COVID-19 forced the college to close its operations at its Missouri and Illinois properties, it sought "business interruption" coverage under its policy from Zurich. *Id.* Zurich denied coverage on several grounds, including that the college's claimed losses fell within the same Contamination Exclusion at issue here. *See Lindenwood Female Coll. v. Zurich Am. Ins. Co.*, 569 F.Supp.3d 970, 974-75 (E.D. Mo. 2021) (quoting exclusion). The college sued, and Zurich moved to dismiss. The district court granted that motion and concluded, among other things, that the Contamination Exclusion barred the college's claim. *See id.* at 976-77.

On appeal, the college argued that "an amendatory endorsement" – *i.e.*, the Louisiana Endorsement – "applie[d] and exempt[ed] its claims from the [contamination] exclusion." *Lindenwood Female Coll.*, --- F.4th ---, 2023 WL 2320670, at *2. The Eighth Circuit disagreed and rejected the college's reading of the Louisiana Endorsement:

> The exemption at issue is found in one of thirty-plus state-specific endorsements—the Louisiana endorsement. The district court found, and Zurich argues, the Louisiana endorsement is geographically limited and inapplicable to Lindenwood's insured property in Illinois and Missouri.

Lindenwood, however, characterizes the reference to Louisiana as a mere title and cites a policy provision stating that "titles of the various provisions and endorsements are solely for reference and shall not in any way affect the provisions to which they relate." Lindenwood also notes that the Louisiana endorsement does not otherwise expressly state that its terms are limited solely to insured property in Louisiana. As such, Lindenwood argues the reference to "Louisiana" is a mere title that implies no geographic limitation and serves only as a label for the parties' reference. In further support of this argument, Lindenwood notes that some of the other state-specific endorsements actually include express geographic limitations beyond the simple identification of the state. Finally, Lindenwood argues its interpretation must be correct—or at least create an ambiguity—because Zurich has since amended the endorsement to include an express geographic limitation.

While not frivolous, we conclude that Lindenwood's argument fails to identify an ambiguity. In our view no lay person—no reasonable insured—could look at the policy as a whole and fail to appreciate that the state-specific endorsements are intended to apply in the respective states. The references to Louisiana and other states are not mere titles; they serve to establish the structure of the policy as a whole. And it would simply make no sense to define a contamination exclusion with express reference to viral contamination in the main body of the policy only to wholly eliminate that same exclusion nationwide in later endorsement that references an individual state.

*Id.*

The Ninth Circuit recently reached the same conclusion.  In *AECOM v. Zurich American Insurance Company*, 2023 WL 1281675 (9th Cir. Jan. 31, 2023), the Ninth

Circuit reviewed the Louisiana Endorsement and rejected an insured's argument that

the endorsement applied to losses incurred outside of Louisiana:

> The policy's "Louisiana Endorsement" applies only in Louisiana. AECOM's contrary argument is foreclosed by *American International Specialty Lines Insurance Co. v. Continental Casualty Insurance Co.*, 49 Cal. Rptr. 3d 1, 14–15 (Ct. App. 2006). AECOM argues that *American International* is distinguishable, because here the policy contains a provision (§ 6.21) stating that "[t]he titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate." Because the "Louisiana Endorsement" only mentions Louisiana in the title, AECOM argues, the reference to "Louisiana" has no effect on the provisions set forth in that endorsement, which must be understood as applying across the board. AECOM's argument is not a reasonable reading of these provisions or of the policy as a whole.
>
> No reasonable reader of the policy could fail to recognize that the 31 state-specific endorsements are intended to modify the policy's terms solely with respect to the particular state at issue. Indeed, the policy cannot reasonably be read otherwise, because several of the state-specific endorsements (including the Louisiana Endorsement) make mutually inconsistent replacements of the same underlying sections of the policy, such as the section concerning "suits against the company." *See People ex rel. Dep't of Parks & Recreation v. West-A-Rama, Inc.*, 111 Cal. Rptr. 197, 201 (Ct. App. 1973) ("It is a cardinal rule of construction that a contract is to be construed as a whole, effecting harmony among and giving meaning to all the parts thereof."). And by recognizing that the Louisiana Endorsement is limited to Louisiana, we do not thereby use the title to alter the substantive meaning of the operative provisions set forth in that section, which is what § 6.21 addresses.

*Id.* at *2.

Finally, the United States District Court for the Western District of Virginia reached the same conclusion in *Carilion Clinic*, *supra*.  In a thorough and well-reasoned opinion, the court in that case rejected many of the same arguments Detroit Entertainment makes here.  The court summarized its analysis as follows:

> Carilion Clinic argues that the court should not apply this clear exclusion for losses caused by virus contamination because of ambiguity created by an amendment to the policy entitled "Amendatory Endorsement – Louisiana." Zurich EDGE Policy, ECF 43-1, at 100–102. [….]
>
> The court does not find Carilion Clinic's argument persuasive. Reading the plain language of the "Amendatory Endorsement – Louisiana," that endorsement applies to Louisiana. To conclude otherwise would require the court to read Louisiana out of this endorsement. Also, it makes no sense to read the Amendatory Endorsement – Louisiana to apply to risks in other states as the language of the endorsements referencing individual states contains different, and sometimes conflicting language. The only way to make sense of all of the language of the Zurich EDGE Policy is to read the Amendatory Endorsement – Louisiana as applying to risks in Louisiana.

*Carilion Clinic*, 583 F.Supp.3d at 734-37 (collecting cases in which other courts have similarly concluded that the Louisiana Endorsement is limited to Louisiana).

The Court finds these decisions persuasive and well-reasoned, and it adopts their conclusions here.  For all of the reasons explained above, it would not make sense to read the Louisiana Endorsement as applying to property located, and/or to losses incurred, outside of Louisiana.    Thus, the Court rejects Detroit

24

Entertainment's argument that the Louisiana Endorsement must be read as applying to Detroit Entertainment's property in Michigan.

## 2

Second, Detroit Entertainment argues in the alternative that the Louisiana Endorsement at least "renders the Policy ambiguous" as to whether the Contamination Exclusion covers losses caused by the presence of viruses, and Detroit Entertainment says that under Michigan law, that ambiguity must be "resolved in favor of coverage." (Resp., ECF No. 48, PageID.3479-3480.)   The Court disagrees that the Louisiana Endorsement creates an ambiguity in the Policy.

Under Michigan law, an insurance policy is ambiguous only "when its words may reasonably be understood in different ways." *Raska v. Farm Bureau Mut. Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982).  And if a policy "however inartfully worded or clumsily arranged, fairly admits of but one interpretation[,] it may not be said to be ambiguous or, indeed, fatally unclear." *Id*.

Here, the Louisiana Endorsement may not "reasonably be understood in different ways." *Id.*  For all of the reasons explained above, the only *reasonable* reading of the Louisiana Endorsement is that it applies to property located, and losses incurred, *in Louisiana*.   Again, Detroit Entertainment's contrary reading is not reasonable because it would create material conflicts between Policy provisions and would render other provisions mere surplusage.  Because Detroit Entertainment's

interpretation of the Louisiana Endorsement is unreasonable, it does not suffice to demonstrate an ambiguity in the Policy. *See*, *e.g.*, *Firebirds Int'l, LLC v. Zurich American Ins. Co*., --- N.E.3d ---, 2022 WL 1604438, at *4 (Ill. Ct. App. 2022) (concluding that "the amendatory endorsements […], including the Louisiana endorsement, are not ambiguous" and noting that "the only reasonable interpretation of the endorsements is that they apply to the risks insured in the named state"); *Carilion Clinic*, 583 F.Supp.3d at 737 (rejecting insurer's argument that "the elimination of the virus exclusion in the Amendatory Endorsement — Louisiana [] create[s] ambiguity sufficient to deny the motion to dismiss" and concluding that "the only plausible way to harmonize the various provisions of the Zurich EDGE Policy issued to Carilion Clinic is to read the Amendatory Endorsement – Louisiana as applying solely to property in Louisiana").[6]

---

[6] In *Novant Health Inc. v. AGLIC*, 563 F.Supp.3d 455, 462 (M.D.N.C. 2021), the court concluded that whether the Louisiana Endorsement applied outside of Louisiana could not be decided at the motion to dismiss stage. But *Novant Health* does not persuade the Court to deny AGLIC's motion to dismiss for two reasons. First, the Court finds the contrary decisions cited above to be more persuasive. *See Carilion Clinic*, 583 F.Supp.3d at 736-37 (following line of cases cited above rather than *Novant Health*). Second, *Novant Health* rested, in large part, on a circumstance that is not present here. More specifically, the court in *Novant Health* did not have before it a logical explanation as to why the policy included endorsements for states other than North Carolina when the insured property was located entirely within that state. *See Novant Health*, 563 F.Supp.3d at 462. In later cases, an AGLIC affiliate explained that it includes the state-specific endorsements when it issues a policy that could cover property that the insured acquires after the policy is first issued. *See Firebirds Int'l,* --- N.E.3d ---, 2022 WL 1604438, at ** 4-5. The endorsements accompany such a policy because such "newly-acquired" property may be located

Finally, Detroit Entertainment argues that the Court should find that the Louisiana Endorsement renders the Policy ambiguous because AGLIC has conceded the point.  In support of that argument, Detroit Entertainment highlights that after AGLIC issued the Policy, AGLIC revised the Louisiana Endorsement such that it now states that it "Only Applies to Locations in Louisiana." (Resp., ECF No. 48, PageID.3479.)   Detroit Entertainment contends that this amendment is "a concession" that the version of the Louisiana Endorsement in the Policy is ambiguous as to whether the endorsement applies to property outside of Louisiana. (*Id*.)  The Court disagrees.

"The fact that [the insurer] amended the Louisiana [E]ndorsement to make the parties' intent clearer does not mean the original language was ambiguous." *Firebirds Int'l,* --- N.E.3d ---, 2022 WL 1604438, at *5. Simply put, the amendment is, at most, evidence that the Louisiana Endorsement could have been even clearer; it is not an admission that the endorsement was unclear. *See Boscov's Dep't Store*, 546 F.Supp.3d at 369 (rejecting argument that AGLIC's "add[ition of] explicit language indicating that the 'Amendatory Endorsement – Louisiana' applies *only* to property in Louisiana" is a "tacit admission" that the Louisiana Endorsement could

---

in a different state. *See id.*  Here, the Policy covers "newly-acquired" property that may be located outside of Michigan. (*See* Policy at § 5.02.21, ECF No. 44-2, PageID.2364.)   Thus, it makes sense for the Policy to include other-state endorsements.

be read to extend beyond Louisiana); *AECOM,* 2023 WL 1281675, at *2 (explaining that "the fact that Zurich subsequently amended its Louisiana Endorsement to make its state-specific application explicit is irrelevant" to whether the endorsement applies outside of Louisiana).  Moreover (and in any event), Detroit Entertainment may not rely upon the amendment to demonstrate an ambiguity in the Louisiana Endorsement because the amendment is extrinsic evidence, and "[t]he courts may not admit extrinsic evidence to 'create ambiguity where [, as here,] the terms of the contract are clear.'" *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 427 (6th Cir. 2016) (quoting *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 595 N.W.2d 832, 837 (1999)).[7] *See also Boscov's Dep't Store*, 546 F.Supp.3d at 369 (holding that because "the language of the Policy [was] clear and

---

[7] Michigan law recognizes a narrow exception to this rule.  "Within certain 'well-defined limits,'" Michigan law permits a party to introduce parol evidence to establish the existence of a latent ambiguity. *Stryker Corp.,* 842 F.3d at 427 (quoting *Ives v. Kimball*, 1 Mich. 308, 313 (1849)).  "The usual case of latent ambiguity will concern, for example, evidence of industry custom or trade usage, *e.g.*, *Sault Ste. Marie [Tribe of Chippewa Indians v. Granholm]*, 475 F.3d [805,] 813 [(6th Cir. 2007)] (unique meaning of the term "wager" in the gaming industry), course of dealing, *e.g.*, *Grosse Pointe Park [v. Park v. Mich. Mun. Liab. & Prop. Pool]*, 702 N.W.2d [106,] 115 [(Mich. 2005)] (insurer's practice of covering certain claims without invoking an exclusion clause), or a misidentification, *e.g.*, *[In re] Kremlick [Estate]*, 331 N.W.2d [228,] 230 [(Mich. 1983)] (identity of a will's beneficiary)." *Id.*  Here, Detroit Entertainment is not seeking to use the amendment of the Louisiana Endorsement to demonstrate a latent ambiguity in the Policy.

unambiguous, there [was] no need to resort to extrinsic aids or evidence," including the amendment of the Louisiana Endorsement).

For all of these reasons, the Court rejects Detroit Entertainment's argument that it is entitled to coverage because the reach of the Louisiana Endorsement is unclear and that ambiguity must be resolved in its (Detroit Entertainment's) favor.

**3**

Finally, Detroit Entertainment argues that even if the Contamination Exclusion applies to some of its claim for coverage, the exclusion does not bar the entire claim.   More specifically, Detroit Entertainment contends that the Contamination Exclusion does not bar its claim for coverage of its "COVID-related *losses*" because it "only excludes 'Contamination, and *any cost* due to contamination' and *does not address 'loss.*'" (Resp., ECF No. 48, PageID.3480-3481; emphasis added.)  The Court disagrees.

A straightforward reading of the Contamination Exclusion confirms that it excludes coverage for more than "costs" incurred as a result of a contamination.  As set forth above, the Contamination Exclusion bars coverage for "Contamination, *and* any cost due to Contamination." (Policy at § 3.03.01.01, ECF No. 44-2, PageID.2347; emphasis added.)  The use of the word "and" signifies the intent to *add* coverage for "any cost due to Contamination," not *limit* or exclude coverage for other losses caused by Contamination.  Thus, the Contamination Exclusion applies

to Detroit Entertainment's claim for business losses caused by the presence of COVID-19.

The Sixth Circuit recently adopted this reading of a similar contamination exclusion. In *Dana Corp.*, *supra*, an insured "sought coverage for business interruption expenses related to COVID-19 under the [] time element provision" of its insurance policy. *Dana Corp.*, 2022 WL 2452381, at *2. That section of the policy provided coverage for losses during a suspension in the plaintiff's business operations. *See id.* at *1. The insurer denied coverage based on a contamination exclusion that was much like the one in the Policy. On appeal, the insured argued, as Detroit Entertainment does here, that the exclusion for contamination did not bar its claimed losses "because the [] exclusion does not use the word 'loss,' but instead refers [only] to costs and damages." *Id.* at *3. The Sixth Circuit disagreed and explained that the insured's narrow reading of the exclusion could not be reconciled with its plain language:

> Looking to the plain language of the policy, the actual or suspected presence of a virus like COVID-19 on Dana's property is contamination. The policy excludes coverage of contamination and any cost from contamination, unless directly resulting from other covered physical damage. Dana's claims are exclusively based on damage and loss related to COVID-19, not other physical damage. Therefore, the contamination of COVID-19 on Dana's property is excluded. Regardless whether the contamination exclusion uses the words "loss," "cost," or "damage," Dana cannot recover for time element loss from this contamination because the policy only covers time

element loss resulting from covered damage. As
contamination from COVID-19 is excluded, there is no
coverage for time element loss from this contamination.

*Id.*

Likewise, in *Firebirds Int'l, supra*, the Illinois Court of Appeals held that the

same Contamination Exclusion at issue here did apply to business losses caused by

the presence of COVID-19 on an insured's property.  The insured in that case, like

Detroit Entertainment here, argued that the Contamination Exclusion did not bar a

claim for business losses caused by the presence of COVID-19 because the exclusion

mentioned only "Contamination, and *any cost* due to Contamination." *Firebirds*

*Int'l*, -- N.E.3d --, 2022 WL 1604438, at *5 (emphasis added).  The court disagreed:

According to Firebirds, the lack of any reference to
business losses means that only costs due to contamination
are excluded.

Firebirds' interpretation, however, dismisses the first two
words of the sentence. The provision does not merely state
that the policy excludes 'any cost due to Contamination.'
Rather, the policy excludes 'Contamination, *and* any cost
due to Contamination.' (Emphasis added.) [....] Read with
the definition inserted for the word, the provision excludes
from coverage 'Contamination, [*together with, in addition
to, as well as*] any cost due to Contamination.'
Furthermore, insertion of a comma after the first word
'Contamination,' indicates that 'Contamination' itself is
considered an independent exclusion not subject to
qualification by any succeeding phrases.

*Id.* at ** 5-6 (emphasis in original). *See also Out West Restaurant Group, Inc. v.*

*Affiliated FM Ins. Co.*, 2022 WL 4007998, at *2 (9th Cir. Sept. 2, 2022) (rejecting

31

argument that similar "contamination exclusion bars coverage only for 'costs' from contamination, not for 'losses,'" because "[t]he exclusion's plain terms, which cover both '[c]ontamination, *and* any cost due to contamination' (emphasis added), preclude that interpretation"); *One Group Hospitality, Inc. v. Employers Ins. Co. of Wausau*, --- F.Supp.3d ---, 2022 WL 4594491, at *8 (W.D. Mo. Sept. 29, 2022) (rejecting same argument).

Because the Contamination Exclusion is not limited to "costs" incurred as a result of a contamination, the exclusion bars Detroit Entertainment's claim for coverage of its business losses caused by the presence of COVID-19.

IV

For all of the reasons explained above, the Court **GRANTS** AGLIC's motion to dismiss (ECF 46) and **DISMISSES** Detroit Entertainment's Second Amended Complaint **WITH PREJUDICE**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  March 7, 2023                    UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 7, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126